[No. H029233. Sixth Dist. Sept. 21, 2006.]

RONALD A. BAPTIST et al., Plaintiffs and Appellants, v.
THOMAS ROBINSON, JR., Defendant, Cross-complainant and Appellant;
THOMAS FOGARTY WINERY, LLC, Defendant, Cross-defendant and
Respondent.

154

COUNSEL

Law Office of Paul B. Kemp and Paul B. Kemp for Plaintiffs and Appellants.

Ericksen, Arbuthnot, Kilduff, Day & Lindstrom, Robert M. Gerhardt and Benjamin A. Emmert for Defendant, Cross-complainant and Appellant.

Cheryl L. Ferguson; Glaspy & Glaspy and Thomas P. Glaspy for Defendant, Cross-defendant and Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, Acting P. J.**—Just before dawn on October 23, 2003, plaintiff Ronald A. Baptist was riding his motorcycle on Highway 85 when he struck a large plastic agricultural bin that had fallen from a pickup truck. He sustained serious injuries. The pickup truck was owned and driven by defendant Thomas Robinson, Jr., who was employed by defendant Thomas Fogarty Winery, LLC (the Winery). The bin belonged to the Winery. In the ensuing personal injury action, Baptist alleged negligence against Robinson and further alleged that the Winery was both vicariously and directly liable for his injuries. Robinson filed a cross-complaint against the Winery for indemnity and contribution.

The Winery filed a motion for summary judgment on the ground that it could not be vicariously liable for its employee's allegedly negligent conduct because Robinson was not acting within the course and scope of his employment at the time of the accident. Instead, he was on an errand on his own time that was solely for his own benefit, namely picking up grapes to make wine for himself. The Winery also argued that there were no facts showing it was directly negligent. The court granted the motion and entered judgment in favor of the Winery. Baptist and Robinson appeal.

Appellants argue that there were triable issues of fact as to 1) whether Robinson's conduct at the time of the accident was foreseeable in light of his

employment responsibilities, in that he was engaged in an activity authorized by the Winery that was reasonably related to his employment and benefited his employer; 2) whether the Winery subsequently ratified Robinson's misconduct; and 3) whether the Winery was negligent in failing to instruct its employees in how to safely secure bins in an open truck and in failing to prevent its employees from making their own private stocks of wine on the Winery premises. After conducting independent review of the record, we find as a matter of law that Robinson was not acting within the course and scope of his employment at the time of the accident. We find further that there were no triable issues of material fact as to the Winery's direct negligence. Accordingly, we affirm the judgment in favor of the Winery.

## BACKGROUND FACTS

Robinson was hired by the Winery in 1998. As part of his employment compensation, he lived in a home on the Winery property in Los Gatos. In 2003, at the time of the accident, Robinson was assistant winemaker and cellar master. His immediate supervisor, Michael Martella, was the head winemaker at the Winery. Dr. Thomas Fogarty is a principal of the Winery. He spent approximately eight hours per week at the Winery. Scott Adams was the general manager of the Winery at the time of the accident, but he did not have his office on the Winery property. The day-to-day winemaking activities at the Winery were the responsibility of Martella.

Martella and Dr. Fogarty had an oral agreement that Martella could make up to 1200 cases of his own label of wine using the facilities at the Winery. The Winery wrote off the costs associated with this in lieu of an annual bonus to Martella. Several years after he started work at the Winery, Robinson told Martella that he was interested in making his own wine. Martella encouraged him to make his own wine. Robinson started making small amounts of his own wine at the Winery. He bought his own grapes, used some of the Winery's equipment to process the wine, and bottled the wine at home in his own bottles. In 2000 he made one barrel of wine. In 2001 and 2002, he made two barrels. He did not sell his wine, but instead gave it away to family and friends.

In 2003, Robinson intended to make a slightly larger quantity of his own wine on the Winery premises. He talked with Martella about this and Martella told him that it would be okay. Martella then mentioned it to Adams in May or June of 2003, and told Adams that Robinson already had a few barrels of his own wine on the property from 2002. Adams told Martella that he wanted the barrels removed from the property and wanted Robinson to discontinue using the Winery facilities to make his own personal wine. Adams also discussed the matter with Dr. Fogarty, who agreed that Robinson should not

be allowed to make his personal wine on the Winery premises. Martella decided to wait until after the fall harvest of 2003 was complete to tell Robinson he would have to stop making his wine on the Winery premises.

Robinson learned of some Syrah grapes for sale at a vineyard in Gilroy called Coyote Springs Vineyard. He arranged to purchase some of those grapes for his own use. The Winery did not make this type of wine. On the evening of October 22, 2003, after work, Robinson borrowed a T-bin from the supply of bins at the Winery facility, put it in his pickup truck and drove home. T-bins are large agricultural bins that are used on the Winery premises for holding crushed grapes during the fermentation process. They were not intended to be taken off of the property to be used for transporting harvested grapes. Robinson did not ask anyone's permission to use the T-bin and no one saw him put it in his truck. He had never before used a T-bin to transport grapes for his own personal stock of wine.

Robinson got up at 5:00 a.m. the next morning, wedged the T-bin in the back of his truck between the wheel wells and secured it with a bungee cord. He then set out for the Coyote Springs Vineyard. He was traveling south on Highway 85 at approximately 5:30 a.m. when he noticed in his rearview mirror that the T-bin was no longer in the truck. He got off the freeway and doubled back to look for the T-bin. He saw signs that there had been an accident where he thought the bin might have fallen. Emergency vehicles had arrived.[1] He contacted law enforcement and told them that he had lost a bin from the back of his truck. After being interviewed by the police, he proceeded to Gilroy, loaded the grapes directly into the bed of his truck, and got back to the Winery to start work by 9:30 a.m. He did not tell Martella or anyone else at the Winery about the accident. He did not think it concerned the Winery because he had been picking up grapes for his own use.

Martella noticed that Robinson had purchased some grapes from the Coyote Springs Vineyard. He thought they looked like good grapes and he decided to purchase some for his own stock. Martella picked up some Syrah grapes from Coyote Springs for his personal wine in a Winery truck. He used the Winery's picking bins rather than T-bins for this. Martella also picked up a load of crushed Syrah grapes for Robinson from the Savannah-Chanelle Vineyard in Santa Cruz. This was after the accident but before Martella knew about it. When he got the grapes for Robinson, Martella used his own truck and loaded the crushed grapes into two T-bins in the back of his truck. He secured the T-bins with straps and winches.

---

[1] Baptist lost control of his motorcycle when he hit the bin and the motorcycle struck the cement divider in the middle of the highway. Baptist was taken from the scene by ambulance to San Jose Medical Center.

In November of 2003, about a month after the accident, Martella learned of the accident when a letter arrived at the winery from the Baptists' attorney. Martella talked to Robinson about it. And he also told Robinson at that time that he had to stop making his own wine at the Winery and that he should remove the barrels of wine that were his.

## PROCEDURAL BACKGROUND

Baptist and his wife Irene Baptist filed a complaint for personal injury against Robinson on January 22, 2004. A first amended complaint was filed on July 8, 2004, which named the Winery as an additional defendant, as well as Macro Plastics, Inc., the maker of the T-bin. The first amended complaint contained causes of action for motor vehicle negligence, general negligence, products liability and loss of consortium. As against the Winery, plaintiffs alleged that the Winery was Robinson's employer and that Robinson was operating the vehicle in the course of his employment at the time of the accident. Plaintiffs further alleged that the T-bin belonged to the Winery and that the Winery was negligent in failing to instruct its employees on the safe means of transporting T-bins. Robinson filed a cross-complaint for indemnity and contribution against the Winery on December 4, 2004.

The Winery filed its motion for summary judgment on February 28, 2005, on grounds that it could not be held vicariously liable because Robinson was not acting within the scope of his employment at the time of the accident, and that the T-bin involved in the accident had been taken and used without the employer's knowledge or consent. Robinson also filed a summary judgment motion, on March 10, 2005, on the ground that, when the accident occurred, he was engaging in conduct reasonably related to his employment and was acting within the course and scope of his employment.

The two motions were heard on May 24, 2005. The court granted the Winery's motion and denied Robinson's motion and judgment was entered in favor of the Winery.

## STANDARD OF REVIEW

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) A defendant is entitled to summary judgment only if "no issues of triable fact appear and the moving party is entitled to judgment as a matter of law." (*Miller v. Department of Corrections*

(2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77]; see also Code Civ. Proc., § 437c, subd. (c).)

"On appeal from a summary judgment, we conduct an independent review, applying the same three-step process as the trial court." (*Burroughs v. Precision Airmotive Corp.* (2000) 78 Cal.App.4th 681, 688 [93 Cal.Rptr.2d 124]; cf. *Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348 [1 Cal.Rptr.3d 32, 71 P.3d 296].) (1) Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought. (2) We then examine the moving party's motion, including the evidence offered in support of the motion. A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit, either because "[o]ne or more of the elements of the cause of action cannot be . . . established" (Code Civ. Proc., § 437c, subd (*o*)(1)) or because the defendant "establishes an affirmative defense to that cause of action." (Code Civ. Proc., § 437c, subd. (*o*)(2).) (3) If the defendant's moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2); see also *Aguilar, supra*, 25 Cal.4th at p. 849.) Summary judgment is proper if all the papers submitted show that there is no issue requiring a trial as to any fact that is necessary under the pleadings. (*Aguilar, supra*, 25 Cal.4th at p. 843; Code Civ. Proc., § 437c, subd. (c).) In such a case the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

In determining whether the parties have met their respective burdens, the court considers all admissible evidence and the inferences reasonably drawn therefrom in the light most favorable to the party opposing the motion. (*Aguilar, supra*, 25 Cal.4th at p. 844.) We recognize that summary judgment " 'is a drastic measure which should be used with caution so that it does not become a substitute for trial.' " (*Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 610 [7 Cal.Rptr.2d 859].) We therefore "liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants' own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].) On the other hand, plaintiffs resisting summary judgment must produce substantial responsive evidence sufficient to establish a triable issue of material fact. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 162 [80 Cal.Rptr.2d 66].) Evidence that simply gives rise to speculation "cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact." (*Id.* at p. 163.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in

favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 850, fn. omitted.)

## ANALYSIS

As against the Winery, the first amended complaint alleged that Robinson was employed by the Winery; that Robinson was acting within the course of his employment when the accident occurred; that the T-bin that fell onto the freeway was owned by the Winery; and that the Winery was negligent in failing to instruct its employees on how to safely transport T-bins. These allegations pleaded causes of action against the Winery both for direct negligence and for vicarious liability under a theory of respondeat superior.

In regard to the theory that the Winery was vicariously liable, appellants contend that there were triable issues of fact as to whether the Winery had authorized the conduct that caused the accident, whether Robinson was engaged in conduct that benefited the Winery, and whether the conduct was reasonably related to, or a foreseeable outgrowth of, Robinson's job duties. As an alternate theory, appellants argue that even if the Winery did not authorize the conduct causing the injury, the Winery is liable because it later ratified Robinson's conduct. As to direct negligence, appellants argue that the Winery failed to instruct its employees regarding safe transportation of T-bins, and also that the Winery failed to make sure that Martella had told Robinson to cease his private winemaking activities, as per Adams's instructions, and that Robinson had done so.

### *Employer Liability Under the Doctrine of Respondeat Superior*

█ The doctrine of respondeat superior imposes vicarious liability on an employer for the torts of an employee acting within the scope of his or her employment, whether or not the employer is negligent or has control over the employee. (*Bussard v. Minimed, Inc.* (2003) 105 Cal.App.4th 798, 803 [129 Cal.Rptr.2d 675]; Civ. Code, § 2338.) As a matter of policy it is considered fair to allocate to the costs of doing business a loss resulting from a risk that arises in the context of the employment enterprise. (*Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003 [47 Cal.Rptr.2d 478, 906 P.2d 440] (*Farmers*).) " ' "[W]here the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' *to the enterprise undertaken by the employer*. [Citation.]" [Citation.] Accordingly, the employer's liability extends beyond his actual or possible control of the employee to include *risks inherent in or created by the enterprise*.' " (*Ibid.*, original italics, quoting *Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676].)

■ The respondeat superior doctrine is to be given a broad application, as the Supreme Court explained in *Farmers.* "For example, '[t]he fact that an employee is not engaged in the ultimate object of his employment at the time of his wrongful act does not preclude attribution of liability to an employer.' [Citation.] Thus, acts necessary to the comfort, convenience, health, and welfare of the employee while at work, though strictly personal and not acts of service, do not take the employee outside the scope of employment. [Citation.] Moreover, ' "where the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer." [Citations.]' " (*Farmers, supra,* 11 Cal.4th at p. 1004.)

■ Although the scope of employment is generally viewed broadly under the respondeat superior doctrine, the Supreme Court made clear in *Farmers* that an employer is not to be held strictly liable for all actions of its employees during working hours. "Significantly, an employer will not be held vicariously liable for an employee's malicious or tortious conduct if the employee *substantially* deviates from the employment duties for personal purposes. [Citations.] Thus, if . . . the misconduct is not an 'outgrowth' of the employment [citation], the employee is not acting within the scope of employment. Stated another way, '[i]f an employee's tort is personal in nature, mere presence at the place of employment and attendance to occupational duties prior or subsequent to the offense will not give rise to a cause of action against the employer under the doctrine of respondeat superior.' [Citation.] In such cases, the losses do not foreseeably result from the conduct of the employer's enterprise and so are not fairly attributable to the employer as a cost of doing business." (*Farmers, supra,* 11 Cal.4th at pp. 1004–1005, original italics.)

■ An essential element of respondeat superior is a causal nexus or reasonable relationship between the duties of employment and the conduct causing injury. "[T]he incident leading to injury must be an 'outgrowth' of the employment [citation]; the risk of tortious injury must be ' "inherent in the working environment" ' [citation] or ' "typical of or broadly incidental to the enterprise [the employer] has undertaken." ' " (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 298 [48 Cal.Rptr.2d 510, 907 P.2d 358].) A related approach is to ask "whether the tort was, in a general way, foreseeable from the employee's duties. Respondeat superior liability should apply only to the types of injuries that ' "as a practical matter are sure to occur in the conduct of the employer's enterprise." ' " (*Id.* at p. 299.) These two approaches are reflected in the Judicial Council of California, Civil Jury Instructions (2003–2004) CACI No. 3720. CACI No. 3720 provides that in order to show that an employee was acting within

the scope of employment when a plaintiff was harmed, the plaintiff must show that the conduct was either "reasonably related to the kinds of tasks that the [employee/agent] was employed to perform" or was "reasonably foreseeable in light of the employer's business or the [agent's/employee's job] responsibilities." (See also *Bailey v. Filco, Inc.* (1996) 48 Cal.App.4th 1552, 1559–1560 [56 Cal.Rptr.2d 333].)

■ An offshoot of the doctrine of respondeat superior is the so-called "going and coming rule." Under this rule, an employee is not regarded as acting within the scope of employment while going to or coming from the workplace. (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 961 [88 Cal.Rptr. 188, 471 P.2d 988].) This is based on the concept that the employment relationship is suspended from the time the employee leaves work until he or she returns, since the employee is not ordinarily rendering services to the employer while traveling. (*Munyon v. Ole's Inc.* (1982) 136 Cal.App.3d 697, 703, fn 1 [186 Cal.Rptr. 424]; *Gipson v. Davis Realty Co.* (1963) 215 Cal.App.2d 190, 209–210 [30 Cal.Rptr. 253].) An exception to this rule is where the employee is engaged in a "special errand" or "special mission" for the employer. (*Ducey v. Argo Sales Co.* (1979) 25 Cal.3d 707, 722 [159 Cal.Rptr. 835, 602 P.2d 755]; *Trejo v. Maciel* (1966) 239 Cal.App.2d 487, 495 [48 Cal.Rptr. 765]; *Sullivan v. Thompson* (1939) 30 Cal.App.2d 675, 677–678 [87 P.2d 62].) In that case the employee is considered to be acting within the scope of employment during the time he or she is engaged in the special errand. (*Boynton v. McKales* (1956) 139 Cal.App.2d 777, 789 [294 P.2d 733].) "Thus, it is necessary to determine the main purpose of injury-producing activity: If it was the pursuit of the employee's personal ends, the employer is not liable." (*Le Elder v. Rice* (1994) 21 Cal.App.4th 1604, 1607 [26 Cal.Rptr.2d 749].)

■ Although it is generally a question of fact whether conduct is within the scope of employment, if the facts are undisputed and no conflicting inferences are possible, the question is one of law. (*Munyon v. Ole's, Inc., supra,* 136 Cal.App.3d 697, 701.)

*The Parties' Respective Showings Regarding Respondeat Superior*

The Winery produced evidence showing the following undisputed facts: The truck that Robinson was driving to Gilroy on the morning of October 23, 2003, was his own truck. The Winery had no ownership interest in the truck. When the accident occurred, Robinson was on his way to buy grapes to make his own personal stock of wine. He paid for the grapes himself. He was not reimbursed by the Winery for any part of the trip. The accident occurred at approximately 5:30 in the morning, before dawn and before Robinson's usual working hours at the Winery. After picking up his grapes, Robinson reported

to work at the Winery later that morning. Robinson did not have permission from anyone at the Winery to take the Winery's T-bin to transport his grapes. He put the T-bin in his truck on the evening of October 22, 2003, after work. No one at the Winery was aware of him taking the T-bin. He had never transported a T-bin in his own vehicle before. He did not tell anyone at the Winery about the accident because he did not think it concerned the Winery since he was not working at the time.

These facts show that, although Robinson was traveling to pick up wine grapes at the time of the accident, he was not engaged in " ' "the enterprise undertaken by the employer," ' " but rather was procuring grapes for making his own stock of wine. (*Farmers, supra,* 11 Cal.4th at p. 1003, italics omitted.) He was not on any "special errand" for his employer, but was on a personal errand for his own benefit on his own time. His trip to Gilroy was not in pursuit of his employment duties and responsibilities as assistant winemaker at the Winery. He had not yet started his workday for the Winery. (See *Ducey v. Argo Sales Co, supra,* 25 Cal.3d 707 [159 Cal.Rptr. 835].) Nor was this a situation where the employee was attending to his own business and the business of his employer at the same time. (See, e.g., *John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [256 Cal.Rptr. 766, 769 P.2d 948].) Robinson's wine was for his own use and for gifts to family and friends. It was not distributed or sold through the Winery and did not produce any profit for the Winery business. In sum, the "main purpose" of Robinson's trip to Gilroy with the T-bin was not to further the employer's enterprise, but to procure grapes for himself. (See *Le Elder v. Rice, supra,* 21 Cal.App.4th at p. 1607.) Under these facts, the Winery, as the moving party, carried the burden of making a prima facie showing that Robinson was not acting within the course and scope of his employment at the time of the accident. The burden then shifted to the plaintiffs to show that a triable issue of one or more material facts existed as to their theory that the Winery was vicariously liable under a theory of respondeat superior. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 849.)

Appellants contend that they produced evidence creating triable factual issues regarding the application of the doctrine of respondeat superior. They contend the facts show that Robinson was authorized by his employer to make his own wine at the Winery and that it was in the course of this authorized activity, which provided benefit to his employer, that the accident occurred. They contend the facts show that Robinson's personal winemaking was reasonably related to his employment duties and that it was foreseeable that he would be hauling grapes to the Winery for this employment-related purpose.

The evidence showed that only Martella had an agreement with Dr. Fogarty to make his own label of wine at the Winery; Robinson had no such

agreement. Dr. Fogarty and Adams had both decided that Robinson would not be allowed to make his own personal stock of wine at the Winery, and Adams believed that Martella had so informed Robinson. However, Martella permitted Robinson to produce a small amount of his own wine and store it on the Winery property. Even after Martella was told by Adams that Robinson must discontinue his personal winemaking activities, Martella decided to let Robinson make his own wine in the fall of 2003.

Although these facts show that Robinson had his supervisor's permission to make small quantities of wine on the premises of the Winery, no facts show that anyone authorized or even permitted him to use one of the Winery's T-bins to pick up and haul grapes for his wine. No one at the Winery knew that Robinson intended to transport grapes the morning of October 23, 2003, or that he was going to use a T-bin for that purpose. T-bins were not intended for use off of the Winery premises, and the record shows that no one at the Winery had ever before used a T-bin to haul harvested grapes in an open truck. Other types of bins, called S-bins, were used to transport grapes from the field to the Winery. Since S-bins were intended to be used off of the Winery premises, they were stamped with the Winery's name. T-bins, on the other hand, were used as vessels to hold crushed grapes during the fermentation process at the Winery. Consistent with this use on the Winery premises, T-bins did not bear the Winery's name. No one saw Robinson take the T-bin and load it into his truck the night before the accident. No one saw him leave before dawn the next morning. The facts therefore do not support the inference, as appellants argue, that Robinson was "authorized" or even "permitted" by his employer to use one of the Winery's T-bins to pick up and transport his own grapes.

Appellants contend there were facts showing that Robinson's personal winemaking benefited the Winery and therefore that his trip to Gilroy furthered the employer's enterprise. They contend the Winery was benefited in several ways: Robinson's personal winemaking enhanced his winemaking skills and enabled him to be a better assistant winemaker and produce better wines for the Winery; Robinson's wine could possibly provide a profit to the Winery in the future, as Martella's wine did; and Robinson's personal winemaking assisted Martella in making his own wine, which produced a profit for the Winery.

As to the first point, it is reasonable to conclude that Robinson's experience making his own wine helped him to develop winemaking skills. However, this is not the type of tangible benefit that can provide the nexus necessary to bring Robinson's conduct at the time of the accident within the course and scope of his employment. The case of *Blackman v. Great American First Savings Bank* (1991) 233 Cal.App.3d 598 [284 Cal.Rptr. 491] illustrates

this. In that case, a written agreement between a bank employee and the bank set forth the terms of an educational assistance program whereby the employer would pay for tuition and book expenses in return for the employee's agreement to pursue a job-relevant degree and remain a bank employee for at least five years. The employee was involved in an accident on her way from the bank to attend a class pursuant to this program. Although there was a stronger nexus in *Blackman* than in our case between the employee's job-related responsibilities and her activity at the time of the accident, the court in that case found that she was not on a special errand for her employer when she was on her way to school and thus was not acting within the course and scope of her employment. While the bank would receive a benefit from her college attendance and future employment, this was only "broadly collateral" to the business of banking. (*Id.* at p. 604.) "Although Great American may have enhanced its banking business by facilitating its employees' educational advancement, the schoolwork has no direct impact on the day-to-day banking operations and the benefit is derived only indirectly over time." (*Ibid.*) The same can be said in the case before us, where any benefit to the Winery from Robinson's improving his skills by making his own wine could be derived only indirectly and over time.

The benefit-to-employer aspect of the respondeat superior doctrine was further examined in the case of *Le Elder v. Rice, supra,* 21 Cal.App.4th 1604. In that case the trial court held that the employee was providing a benefit to the employer at the time the automobile accident occurred, for several reasons: The employee was on call 24 hours a day; the employee was reimbursed by the employer for auto and pager expenses; the employee's use of the company van was a typical part of the employer's business enterprise; and the employee was returning home to make a business call at the time of the accident. The Court of Appeal disagreed that these facts were sufficient to invoke the doctrine of respondeat superior. The court held that "[t]he existence or nonexistence of employer benefits is not dispositive in determining vicarious liability." (*Id.* at p. 1609.) Rather the dispositive question is what was the primary purpose of the activity that produced the injury.

In the *Le Elder* case, the accident occurred when the employee was returning home from driving his children to school in the company van. At home he intended to eat breakfast and read the paper before making a business call. Thus the purpose of the activity he was engaged in at the time of the accident was "purely personal." (*Le Elder v. Rice, supra,* 21 Cal.App.4th at p. 1608.) The court therefore found, as a matter of law, that the employee was not within the scope of employment when the injury occurred. Here Robinson was similarly engaged in an errand of his own at the time of the accident. Even if there was some benefit the employer might ultimately derive from Robinson improving his own winemaking abilities, the purpose

of his trip on October 23, 2003, was purely personal and his employer thus cannot be vicariously liable.

Appellants' contention that Robinson's winemaking could provide a profit to the Winery because Martella's wine did so, is entirely speculative and thus "is insufficient to establish a triable issue of material fact." (*Sangster v. Paetkau, supra,* 68 Cal.App.4th at p. 163.) Robinson made a small amount of wine; Martella made up to 1200 cases a year. Robinson had no arrangement with Dr. Fogarty, as Martella had, to produce his own label of wine at the Winery. And even if we assume that the Winery profited from the sale of Martella wines,[2] it simply does not follow from the fact that Martella's winemaking venture may have produced a profit for the Winery that Robinson's winemaking would also benefit the Winery.

Finally, the record does not show, as appellants assert, that Robinson's "express job duties" at the Winery included assisting Martella in making Martella's own label of wine. Dr. Fogarty stated that he did not know if Martella used other employees to help him make his own wine. Although Martella purchased some Syrah grapes from the Coyote Springs Vineyard after evaluating the grapes that Robinson had purchased there, these facts do not reasonably support an inference that part of Robinson's employment duties at the Winery was to assist Martella to make Martella's own wine. In sum, appellants were unable to show, under the so-called benefit test, that Robinson was " ' "[e]ither directly or indirectly . . . serving his employer" ' " when he was on his way to purchase his own grapes the morning of the accident. (*Farmers, supra,* 11 Cal.4th at p. 1004.)

Appellants contend that there were triable issues of fact as to whether there was a reasonable relationship between the conduct causing the accident and Robinson's employment at the Winery, and further that there were triable issues of fact as to whether the accident was reasonably foreseeable in light of the employer's business as a winery and Robinson's job as assistant winemaker. (See CACI No. 3720.) Appellants' theory is that allowing employees to make their own wine was a customary incident of the employment relationship and that this activity would reasonably include transporting grapes to the Winery from other vineyards in the area. In support of their theory, appellants produced evidence showing the following facts: Dr. Fogarty permitted Martella to make his personal label of wine on the

---

[2] Whether Martella's wine produced a profit for the Winery was in dispute. In Dr. Fogarty's deposition he testified that it was his understanding that Martella could sell his own label of wine at the Winery's tasting room and that the Winery would make a profit from this. The Winery later produced evidence by its accountant that the Martella wine did not produce a profit for the Winery. It was not sold on the Winery's premises until 2004, and the arrangement with Martella was that the Winery would write off the costs of his personal wine production as a bonus to him.

premises, and to use equipment and facilities at the Winery to do so. Martella was Robinson's direct supervisor and Dr. Fogarty expected that Robinson, as assistant winemaker, would follow the directions of Martella, who was head winemaker and responsible for the day-to-day operation of the Winery. Martella became aware that Robinson was making small quantities of his own personal wine on the premises and encouraged him in this activity. In making his own wine, with Martella's permission, Robinson was crushing his grapes at the Winery, using the Winery's T-bins as fermentation vessels, using a grape press and barrels belonging to the Winery, and using the Winery's forklift to unload his grapes. Martella picked up some crushed grapes for Robinson and brought them to the Winery, knowing that Robinson was going to use the grapes for making his own personal wine. When Martella picked up the crushed grapes, he used T-bins in the back of his pickup truck. Martella allowed Robinson to finish making his own wine from the 2003 harvest, even though Adams had told him that summer to tell Robinson to stop making personal wine on the premises.

Appellants contend that these facts create a triable issue that Robinson had the ostensible approval of his employer to make his wine using the Winery's equipment and facilities and to transport grapes from area vineyards. In appellants' view, this can therefore be considered to be a part of Robinson's employment and winemaking training at the Winery. Appellants further contend that because Martella used T-bins to pick up grapes for Robinson several weeks after the accident, it can be inferred that Robinson was also authorized, or at least permitted, to use the T-bins for that purpose. Robinson's trip to pick up the grapes for his own wine with the T-bin on the morning of October 23, 2003, was therefore reasonably connected to his employment and was a foreseeable consequence of his employment.

While we must view the evidence in a light most favorable to appellants, we cannot agree that the inferences appellants draw from the facts are reasonable ones. For instance, it does not logically follow from the fact that Martella allowed Robinson to pursue his own winemaking, at least until the 2003 harvest was over, that Robinson's personal winemaking activities constituted part of his employment training or employment benefits at the Winery. Adams asked Martella about this and Martella told him that Robinson's production of small quantities of his own personal wine was "absolutely not" an essential part of his job. There is no evidence that allowing employees to make their own personal stocks of wine was a "recognized, established, and encouraged custom," so as to be a customary incident of the employment relationship, either at the Winery in this case or in the winemaking industry. (*McCarty v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 677, 683 [117 Cal.Rptr. 65, 527 P.2d 617].) In fact, in this case Martella, the head winemaker, was the only employee who had an arrangement with Dr. Fogarty to make his own wine on the premises.

Furthermore, Martella's use of two T-bins to pick up some crushed grapes for Robinson does not tend to show that Robinson had permission or authorization from his employer to use T-bins to transport harvested grapes. The undisputed evidence was that Robinson did not have permission to use the T-bin and no one at the Winery saw him taking it or knew he was using it. Moreover, when Martella used the T-bins to pick up the crushed grapes from the Santa Cruz vineyard, he did not know that Robinson had used a T-bin to transport grapes two weeks earlier. This was the first time either Robinson or Martella had ever used T-bins for this purpose. It is not disputed that the T-bins were not intended for transporting grapes off the premises but rather were intended for use as fermenting bins at the Winery. It cannot be inferred from these facts that the use of T-bins to transport uncrushed grapes was a customary or typical occurrence in the Winery's winemaking business. The conduct producing the injury was therefore not a reasonably foreseeable risk " 'inherent in or created by the [employer's] enterprise.' " (*Farmers, supra,* 11 Cal.4th at p. 1003, italics omitted.)

Plaintiffs' theory that Robinson's conduct causing the accident was reasonably foreseeable in light of his employer's business and his job responsibilities rests primarily on *Avila v. Standard Oil Co.* (1985) 167 Cal.App.3d 441 [213 Cal.Rptr. 314] (*Avila*). In *Avila,* Ernesto Hernandez and Elias Meza worked at a Standard Oil service station. Meza was Hernandez's trainee. When Hernandez had started working at the station, he had been told by his supervisor Kevin Ganz that he could not work on personal vehicles at the station during business hours. However, several years later Ganz allowed Hernandez to store his motorcycle, which needed repairs, at the station. On the day in question Ganz was present when Hernandez was working on his motorcycle at the station during regular business hours and Meza was helping him. Hernandez asked Meza to go get a part for him and loaned Meza his father's truck. On the way to do this errand, Meza lost control of the truck and struck the plaintiffs.

The court in *Avila* found that there were triable factual issues as to whether Meza was acting within the scope of his employment at the time of the accident, whether Hernandez had ostensible approval to work on his motorcycle during the work shift, and whether such approval was part of the exchange of benefits between Hernandez and his employer. The key facts were that Meza was doing an errand that his supervisor had specifically asked him to do, and that this occurred during working hours. The court further found there were facts from which a fact finder could conclude that Hernandez had ostensible authority to work on his motorcycle and that this was part of the exchange of benefits between Hernandez and his employer. Although there was a standing rule against working on personal vehicles during business hours, Ganz had specifically allowed Hernandez to bring his motorcycle and store it at the station, knew Hernandez was repairing it, and

was present during some of the time when Hernandez and Meza were working on it. This, the court found, created a triable issue of fact that the rule against working on personal vehicles had been revoked, and that working on personal vehicles at the station during business hours may have been a benefit of the employment relationship. Meza was a trainee instructed to follow Hernandez's directions. The court concluded, under all of these circumstances, that a fact finder could determine that it was foreseeable that Hernandez would direct Meza to run an errand off the premises in furtherance of an employment-related purpose. Thus the grant of summary judgment in favor of the employer was improper. (*Avila, supra,* 167 Cal.App.3d at p. 448.)

The case before us is distinguishable from *Avila* in several important respects. In our case, Robinson was never told by his supervisor, Martella, or by anyone at the Winery to go and pick up grapes on the morning of October 23, 2003. Robinson planned and paid for the trip himself, made his own arrangements with the Coyote Springs Vineyard, and loaded the T-bin in his truck the night before. His errand was for his own purposes and not at the direction of Martella or anyone at the Winery. No one saw him take the T-bin, put it in his truck, or leave the premises. And none of this occurred during regular business hours as in *Avila*. Although Martella was aware that Robinson was making his own wine, contrary to the express prohibition of management, there was no evidence from which to draw a reasonable inference that Robinson's personal winemaking was part of the exchange of benefits of his employment. In fact his employer had only recently learned of this activity and had responded by telling Robinson's supervisor to put an end to it. A fact finder could not reasonably find under all of these circumstances that Robinson's "main purpose [was] to carry on the business of the employer" when he set out on the morning of October 23, 2003. (*Avila, supra,* 167 Cal.App.3d at p. 448.)

*Ratification of Employee's Conduct*

As an alternate theory to respondeat superior, an employer may be liable for an employee's act where the employer either authorized the tortious act or subsequently ratified an originally unauthorized tort. (*Shultz Steel Co. v. Hartford Accident & Indemnity Co.* (1986) 187 Cal.App.3d 513, 519 [231 Cal.Rptr. 715]; Civ. Code, § 2339.) The failure to discharge an employee who has committed misconduct may be evidence of ratification. (*Murillo v. Rite Stuff Foods, Inc.* (1998) 65 Cal.App.4th 833, 852 [77 Cal.Rptr.2d 12].) The theory of ratification is generally applied where an employer fails to investigate or respond to charges that an employee committed an intentional tort, such as assault or battery. (*McChristian v. Popkin* (1946) 75 Cal.App.2d 249 [171 P.2d 85]; *Murillo v. Rite Stuff Foods, Inc., supra,* 65 Cal.App.4th 833.)

Whether an employer has ratified an employee's conduct is generally a factual question. (*Siva v. General Tire & Rubber Co.* (1983) 146 Cal.App.3d 152 [194 Cal.Rptr. 51].)

Appellants contend that the facts show that the Winery "ratified" Robinson's personal winemaking activities because it did nothing to discipline him following the accident with the T-bin and in fact promoted him in April of 2004 to on-site sales manager. But appellants do not show how Robinson's personal winemaking activities constituted any form of misconduct that was later ratified. There is nothing inherently harmful to others in this activity. Furthermore, the record reflects that after Martella learned of the accident, he told Robinson, as he had previously been instructed to do by the general manager, to discontinue his personal winemaking activities and to remove any stock of personal wine he was storing on the Winery premises. Robinson's personal stock of wine was removed from the premises by January of 2004. Appellants do not contend that the Winery in some way ratified or approved of Robinson's use of the T-bin, or his failure to secure the T-bin in the back of his truck, the conduct that caused the harm. In sum, the theory that an employer can be liable through ratifying an employee's wrongful conduct does not apply to these circumstances.

### Direct Negligence

■ In their first amended complaint appellants alleged that the Winery's negligence was a cause of the injury in that the Winery failed to instruct its employees on safe methods of securing T-bins in an open truck. The elements of a negligence cause of action are the existence of a legal duty of care, breach of that duty, and the breach as the proximate cause of the resulting injury. (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917–918 [50 Cal.Rptr.2d 309, 911 P.2d 496].)

In its summary judgment motion, the Winery produced evidence showing that the T-bins at the Winery were not intended to be used to transport harvested grapes. When grapes were transported from the field to the Winery, another kind of bin, called an S-bin, was used. T-bins were used for fermenting crushed grapes on the premises of the Winery. The record shows that Robinson's use of a T-bin on October 23, 2003, to transport his grapes in his own vehicle was the first time he, or anyone else at the Winery, had used a T-bin in this manner. No one knew he was going to use the T-bin and no one saw him take it. Martella's use of two T-bins several weeks later to pick up crushed grapes does not tend to establish that this was a common practice at the Winery. According to Martella, this was the first time he had used T-bins for this purpose and at the time he did not know about Robinson's use of the T-bin. The evidence thus shows that transporting grapes by means of

T-bins in pickup trucks was not a typical or common aspect of the employment duties at the Winery. It was not reasonably foreseeable that someone would be harmed by a T-bin that was being used in a manner that it was not intended to be used. Therefore, there was no duty of care on the part of the Winery to prevent such harm by providing training to its employees in safe methods of securing T-bins for transportation in open trucks. Consequently there can be no breach of duty.

 Appellants cited no case authority in their opening brief to support their contention that the Winery breached a duty of care to them by failing to give employees safety instructions regarding transporting T-bins. However, in their reply brief they expand on this point, citing numerous cases to support the argument that Robinson's use of the T-bin was not an intervening or superseding cause of the injury. (See, e.g., *Jackson v. Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830 [20 Cal.Rptr.2d 913]; *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49 [192 Cal.Rptr. 857, 665 P.2d 947]; *Robison v. Six Flags Theme Parks Inc.* (1998) 64 Cal.App.4th 1294 [75 Cal.Rptr.2d 838].) When new arguments are raised in the reply brief, to which respondent has no opportunity to respond, we are not required to consider them. (*Pallco Enterprises, Inc. v. Beam* (2005) 132 Cal.App.4th 1482 [34 Cal.Rptr.3d 490].) Furthermore, to the extent that these cases discuss proximate cause, they are not relevant here. As we have concluded, the facts do not show the existence of a legal duty. If there is no duty, consideration of proximate cause is not necessary. (*Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 306 [34 Cal.Rptr.2d 498].)

Appellants make the additional argument that the Winery was negligent in failing to follow through to ensure that Martella had told Robinson to stop making wine on the premises, as Adams had directed Martella to do, and that Robinson had in fact stopped making his personal wine at the Winery. Appellants did not plead this theory of negligence and did not raise it in the summary judgment proceedings. Consequently, respondent did not have the opportunity to respond to it and appellants cannot raise it for the first time on appeal. (See *In re Marriage of Eben-King & King* (2000) 80 Cal.App.4th 92, 117 [95 Cal.Rptr.2d 113] ["[I]ssues or theories not properly raised or presented in the trial court may not be asserted on appeal, and will not be considered by an appellate tribunal."].) Furthermore, this argument presupposes that the Winery had a duty to prevent Robinson from making his own wine on the premises. There is no evidence that this activity posed a danger or risk of harm to others. Therefore the Winery could not have breached a duty of care by failing to ensure that Robinson's winemaking activities had ceased.

## DISPOSITION

The judgment in favor of Thomas Fogarty Winery, LLC, is affirmed.

Mihara, J., and McAdams, J., concurred.

A petition for a rehearing was denied October 12, 2006, and the petition of plaintiffs and appellants for review by the Supreme Court was denied November 29, 2006, S147581.