Filed 3/21/13  Steward v. Bd. of Trustees Cal. State Univ. CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| NORMA STEWARD,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY,<br><br>    Defendant and Respondent. | D061558<br><br><br><br>(Super. Ct. No.<br> 37-2010-00057080-CU-PO-NC) |

APPEAL from a judgment of the Superior Court of San Diego County,

Timothy M. Casserly, Judge.  Affirmed.


I.

INTRODUCTION

Plaintiff Norma Steward appeals from a judgment entered in favor of defendant

Board of Trustees of the California State University (CSU).  The trial court granted

CSU's motion for summary judgment on the ground that the undisputed facts establish

that CSU may not be held liable for an accident caused by CSU employee (and codefendant in the underlying action) Dennis Guseman. Guseman was on his way to have breakfast with a former colleague before going to work when the accident occurred.

On appeal, Steward argues that summary judgment in CSU's favor was improper because there remain material questions of fact related to either of two possible theories of respondeat superior liability. First, she contends that the trial court erred in concluding that, as a matter of law, Guseman's breakfast meeting with his former colleague was a personal errand and did not come within the scope of his employment. According to Steward, if the trial court had properly concluded that there remains a factual dispute as to whether the breakfast meeting had a business purpose, then it is possible that Guseman could be found to have been on his way to "work" at the time of the accident, and that his commute to the breakfast meeting could therefore be considered to fall within the scope of his employment.

Steward next argues in the alternative that even if Guseman's planned breakfast was a purely personal endeavor as a matter of law, CSU could still be liable under the theory that Guseman's commute that morning was within the scope of his employment, and that the breakfast meeting was simply a minor deviation from, rather than a substantial abandonment of, his commute to work at the CSU San Marcos (CSUSM) campus.

We affirm the judgment in favor of CSU because Steward cannot prove that Guseman's conduct in driving to breakfast that morning was reasonably related to his job, or that his personal errand to meet a former colleague and friend for breakfast was

2

reasonably foreseeable in light of CSU's business or Guseman's job responsibilities, such that CSU may be held liable for the accident that Guseman caused on his way to breakfast.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

1.    *The accident*

On October 23, 2009, at approximately 8:05 a.m., Guseman was driving eastbound on La Plaza Drive, toward an intersection at San Pablo Drive, in San Marcos. Upon reaching the intersection, Guseman attempted to turn left onto San Pablo Drive. Steward and her husband were crossing the intersection on foot at that time. Guseman struck Steward and her husband with his vehicle. Steward's husband died from injuries he incurred as a result of the accident, and Steward suffered physical and emotional injuries.

2.    *Guseman's employment at CSUSM*

From 2003 to June 2011, Guseman was the dean of the College of Business Administration at CSUSM. In this role, Guseman had a number of responsibilities. Guseman's primary function was to serve as the chief academic and administrative leader of the College of Business Administration. Guseman hired teachers, mentored faculty, managed budgets, engaged in fundraising, and promoted the college.

Guseman generally arrived at work at around 9:00 a.m. However, he did not have regular working hours and was not required to be at the college at any certain time. Guseman sometimes traveled for work, but he typically worked from his office on the

3

CSUSM campus. Although Guseman was expected to travel for work on occasion and often used his own vehicle to do so, CSUSM did not require that Guseman own or operate a vehicle for purposes of this travel. CSUSM did not reimburse Guseman for travel between his home and his campus office. However, when Guseman drove his own car for other work-related purposes, he would submit mileage reimbursement requests.[1]

  3.  *The evidence regarding Guseman's planned breakfast on the morning of the accident*

On the morning of the accident, Guseman left his home in Oceanside, California to go to a restaurant called Leann's, which is located in the Lake San Marcos area. Guseman had planned to meet his friend and former CSUSM colleague, Vicki Golich, and her husband for breakfast that morning at 8:00 a.m. Golich had been the dean of Arts and Sciences at CSUSM from 2003 to 2009. In the summer of 2009, Golich left her position at CSUSM to become a provost at Metropolitan State College in Colorado.

While Golich was employed at CSUSM, she and Guseman would socialize outside of work. For example, they attended jazz concerts, went to the races at the Del Mar Race Track, and visited some pubs near the campus. When Golich and Guseman attended social events together, either their spouses or other coworkers from CSUSM were present.

---

[1] Guseman's driver's license was suspended in May 2010 as result of the accident. The suspension lasted for one year. During this time, Guseman was not permitted to operate a vehicle for any purpose. Guseman continued to fulfill his duties as dean of the College of Business Administration at CSUSM while his license was suspended.

4

Golich, Guseman, and another dean at CSUSM, Mark Baldwin, would occasionally have breakfast together at Leann's. CSUSM had no role in organizing these breakfast meetings and did not require that the deans attend these breakfasts. Rather, the friends got together because they enjoyed each other's company.

On October 9, 2009, Golich e-mailed Guseman and Baldwin to inform them that she and her husband would be returning to San Marcos later in October. She indicated that she was coming back to the San Diego area for a weekend, mainly to attend a charity event at an organization affiliated with CSUSM that supports arts education. Golich asked whether Baldwin and Guseman would like to meet her for breakfast on the morning of October 23. Guseman responded that it would be great to see Golich and "catch up," and said that he would arrange his schedule so that he could meet her for breakfast.[2]

Golich testified that she intended to discuss Guseman's "dating escapades" and "gossip about work" at the breakfast. She also anticipated that the group would discuss the kind of house that she and her husband were looking for in Colorado, as well as her impressions of her new job. According to Golich, they would probably also have discussed their disagreement with the CSUSM provost's decision regarding Golich's replacement. Golich believed that the conversation would likely have focused on personal things, in part because her husband was going to be joining them.

---

[2] Although the original plan apparently was that Guseman, Baldwin and Golich would meet for breakfast, it later became clear that Baldwin would not be joining Guseman and Golich, and Golich indicated that she would bring her husband along to the breakfast meeting.

5

Golich testified that although she had planned to discuss the current gossip about things that were going on at CSUSM, her interest in those matters was personal, and she did not have any "business interest" or "institutional purpose" in what was going on at CSUSM. She acknowledged that her interest in "gossip" about CSUSM included finding out about how CSUSM was functioning and what the faculty's views were about how things were being run at the school. She anticipated that they might also discuss problems involving shared governance, and the possibility of a no-confidence vote by the faculty regarding the provost.

Guseman confirmed that he had no business purpose for attending the breakfast and said that he did not intend to conduct business while at the breakfast. Rather, Guseman intended to catch up with his friend and former colleague. He did intend to discuss the current happenings at CSUSM with Golich, including the possible no-confidence vote on the provost. Guseman e-mailed Golich, "It will be interesting to see what happens here. The faculty are talking about taking a vote of no confidence on the Provost, maybe even next week—I have ordered my popcorn already so I will be sure to have plenty to watch all of the action."

CSUSM neither required nor requested that Guseman attend the breakfast with Golich when she came in from out of town. Guseman's supervisor was unaware that he would be meeting Golich for breakfast. Guseman's secretary also did not know about Guseman's breakfast plans that morning.

Guseman had planned to spend approximately two hours at breakfast with Golich and her husband that morning, and to drive to the CSUSM campus after the breakfast to attend a 10:00 a.m. meeting.

B.    *Procedural background*

Steward filed a complaint against Guseman and CSU on July 6, 2010, alleging a single cause of action for negligence.

CSU filed a motion for summary judgment on August 31, 2011.  After full briefing on the motion, the trial court held a hearing on November 18, 2011.

On December 5, 2011, the trial court entered a minute order granting judgment in favor of CSU.  The clerk entered judgment on February 1, 2012.  Steward filed a timely notice of appeal.

III.

DISCUSSION

A.    *Governing law*

1.    *The law governing summary judgment*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)  A defendant may make this showing by establishing that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action.  (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 466.)  "[O]nce a moving defendant has 'shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established,' the burden shifts to

7

the plaintiff to show the existence of a triable issue; to meet that burden, the plaintiff 'may not rely upon the mere allegations or denials of its pleadings . . . but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . .' [Citations.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477.)

In reviewing a trial court's ruling on a motion for summary judgment, the reviewing court makes " 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law. [Citations.]' [Citation.]" (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1143.)

2.      *The law governing respondeat superior liability*

"Under the theory of respondeat superior, an employer is vicariously liable for an employee's torts committed within the scope of employment." (*Bailey v. Filco, Inc.* (1996) 48 Cal.App.4th 1552, 1558 (*Bailey*).) Whether an employee was acting within the course and scope of his employment is generally a question of fact, but if the facts are undisputed and no conflicting inferences are possible, the question is one of law. (*Munyon v. Ole's, Inc.* (1982) 136 Cal.App.3d 697, 701.)

Respondeat superior liability is imposed for three policy reasons: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 209). Stated another way, " ' "[the] modern justification for

8

vicarious liability [at least where liability is predicated upon negligence] is a rule of policy, a deliberate allocation of a risk.  The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. . . . " ' [Citations.]  'The principal justification for the application of the doctrine of *respondeat superior* . . . is the fact that the employer may spread the risk through insurance and carry the cost thereof as part of his costs of doing business.'  [Citations.]  '[The] modern and proper basis of vicarious liability of the master is not his control or fault but the risks incident to his enterprise.'  [Citation.]"  (*Huntsinger v. Glass Containers Corp.* (1972) 22 Cal.App.3d 803, 808 (*Huntsinger*); see also *Lazar v. Thermal Equipment Corp.* (1983) 148 Cal.App.3d at pp. 463-464 (*Lazar*) [The losses caused by the torts of employees " ' " 'are placed upon the employer because, having engaged in an enterprise which will, on the basis of past experience, involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large' " ' "].)

" ' "[W]here the question is one of vicarious liability, the inquiry [with respect to the question whether an employee was acting within the scope of his employment] should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer." ' "  (*Farmers Insurance Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003 (*Farmers*), citations and italics

omitted.)  "Categorization of an employee's action as within or outside the scope of employment . . . begins with a question of foreseeability, i.e., whether the accident is part of the inevitable toll of a lawful enterprise."  (*Lazar*, *supra*, 148 Cal.App.3d at p. 464.)  " ' "[F]oreseeability" [in the context of determining scope of employment] merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.  [Citation.]'  . . . [Citations.]"  (*Farmers*, *supra*, at p. 1004, italics omitted.)

Courts have determined that an employer may sometimes be liable for an employee's wrongful conduct that occurs while the employee is undertaking acts that are "necessary to the comfort, convenience, health, and welfare of the employee" while that employee is at work, even though those acts are entirely personal.  (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 161 (*Baptist*).)  Further, in situations in which an employee combines his or her personal business with the employer's business, or is " ' "attending to both at substantially the same time," ' " the employee may be found to be within the scope of his or her employment unless one could reasonably conclude only that the employee was not directly or indirectly serving the employer's business.  (*Ibid*.)

However, an employer is not strictly liable for every tort committed by an employee during working hours.  (*Baptist*, *supra*, 143 Cal.App.4th at p. 161.)  Specifically, if an employee " 'substantially deviates from the employment duties for personal purposes,' " or if the employee's tort is "personal in nature," the mere fact that an employee is at the workplace and was attending his or her work-related duties just before

10

and/or just after the wrongful act will not permit imposition of respondeat superior liability on an employer. (*Ibid.*) In such cases, " 'the losses do not foreseeably result from the conduct of the employer's enterprise and so are not fairly attributable to the employer as a cost of doing business.' [Citation.]" (*Ibid.*)

CACI No. 3720 reflects the two ways in which a causal nexus or reasonable relationship between an employee's duties and the conduct that causes injury may be established. That instruction provides "that in order to show that an employee was acting within the scope of employment when a plaintiff was harmed, the plaintiff must show that the conduct was either 'reasonably related to the kinds of tasks that the [employee/agent] was employed to perform' or was 'reasonably foreseeable in light of the employer's business or the [agent's/employee's job] responsibilities.' [Citation.]" (*Baptist*, *supra*, 143 Cal.App.4th at pp. 161-162.)

a.     *The going and coming rule*

Employees generally are not regarded as acting within the scope of employment during their commutes to and from work. This rule is commonly referred to as the " 'going and coming rule,' " and is based on the notion that the employee is not ordinarily rendering services to the employer while commuting. (*Baptist*, *supra*, 143 Cal.App.4th at p. 162; see also, e.g., *Blackman v. Great American First Savings Bank* (1991) 233 Cal.App.3d 598 (*Blackman*) [an employee is considered to be acting outside the scope of employment while engaged in the ordinary commute to and from the workplace under the going and coming rule].) In other words, "[t]he risks associated with an employee's commute to and from work generally are not . . . inherent in, typical of, or created by

11

their work." (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 469-470 (*Hartline*).)

    b.    *Exceptions to the going and coming rule*

There are several exceptions to the going and coming rule. The common factor in these exceptions is that the employee was making a special, non-routine trip on behalf of his or her employer at the time the plaintiff was harmed, or the employee's driving the employee's own vehicle ultimately benefited his or her employer. (*Hinson v. Workmen's Comp. Appeals Board* (1974) 42 Cal.App.3d 246, 249.)[3]

_____

[3]    We cite *Hinson* to provide helpful context, recognizing that it is describing the going and coming rule, and its exceptions, in the context of workers' compensation. While the test for "arising out of and in the course of employment" under workers' compensation law is not identical to the test for "scope of employment" in the area of respondeat superior, many courts that have analyzed respondeat superior liability under the going and coming rule refer to, and rely on, cases in which courts have considered the going and coming rule as applied in the workers' compensation area. (See e.g., *Lobo v. Tamco* (2010) 182 Cal.App.4th 297, 301, fn. 3 (*Lobo*) ["Because benefit to the employer is one of the principal considerations under both the tort rule of respondeat superior and workers' compensation law, the application of the going and coming rule is similar for both purposes"]; *Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 962, fn. 3 ["Although the test under the workmen's compensation law of 'arising out of and in the course of the employment' (Lab. Code, § 3600), is not identical with the test of 'scope of employment' under the *respondeat superior* doctrine [citation], one of the principal considerations under compensation law is the benefit to the employer [citations]; both fields of law are concerned with the allocation of the cost of industrial injury; and the two tests are closely related [citation]"]; *Huntsinger*, *supra*, 22 Cal.App.3d at p. 808 ["Thus, while it may constitute pouring new wine into an old bottle, the 'going and coming' rule and its exceptions in the tort cases are concerned with the allocation of the economic cost of an injury resulting from a risk incident to business enterprise, and the social philosophy underlying the rule and its exceptions in the tort field is now substantially similar to that underlying workmen's compensation"].) " ' "Scope of employment" ' for purposes of respondeat superior is more restrictive than ' "arising out of and in the course of employment" ' for workers' compensation. [Citation.] That is, '[i]f an injury is within the "scope of employment," it will probably be "arising out of and occurring in the course

12

While imposition of respondeat superior liability does not generally require that an employee's actions benefit the employer, courts have required injured plaintiffs to show some benefit to the employer when invoking an exception to the "going-and-coming rule." (See *Bailey*, *supra*, 48 Cal.App.4th at p. 1562 [respondeat superior not applied to employer where employee injured third party in car accident while on a paid break]; *Caldwell v. A.R.B., Inc.* (1986) 176 Cal.App.3d 1028, 1033, 1038-1039 (*Caldwell*) [employer not held liable for plaintiff's injuries from car accident caused by employee where all employees were paid travel allowance whether or not they actually drove their car to work]; *Anderson v. Pacific Gas & Electric Co.* (1993) 14 Cal.App.4th 254, 261 (*Anderson*) [employer did not receive a sufficient benefit from the payment of a travel allowance so as to impose liability for plaintiff's injuries caused by employee in car accident].) Thus, exceptions to the going and coming rule have been found when "the employee's trip involves an incidental benefit to the employer [that is] not common to commute trips by ordinary members of the work force." (*Blackman*, *supra*, 233 Cal.App.3d at p. 602.)

---

of employment"; however, the reverse is not true.' [Citation.]" (*Hartline*, *supra*, 132 Cal.App.4th at p. 468.)

While there is, in our view, some utility in referring to the analysis from workers' compensation law for purposes of considering an employer's liability for an employee's tort, workers' compensation cases are not considered controlling in the respondeat superior arena: " '[A]lthough worker's compensation cases can be helpful in determining the employer's vicarious liability for its employee's torts [citation], they are not controlling precedent "when liability is predicated upon respondeat superior principles." ' [Citations.]" (*Hartline*, *supra*, 132 Cal.App.4th at p. 468.)

(i.) *The "special errand" exception*

One exception to the going and coming rule, which has been referred to as the "special errand" exception, applies where the employee is on a special errand for the employer, "either as part of his regular duties or at a specific order or request of his employer." (*Blackman*, *supra*, 233 Cal.App.3d at p. 602.) The employer is deemed "liable for torts committed by its employee while traveling to accomplish a special errand because the errand benefits the employer. [Citation.]" (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057.) An employee who is coming from his or her home or returning to it in the course of a special errand " 'is considered to be in the scope of his employment from the time that he starts on the errand until he has returned or until he deviates therefrom for personal reasons.' " (*Felix v. Asai* (1987) 192 Cal.App.3d 926, 931 (*Felix*).)

The special errand exception has been held to apply, for example, when an employee is called to work to perform a task for the employer at an irregular time, and when an employer asks an employee to perform a special errand on the employee's commute home from work. (*Felix*, *supra*, 192 Cal.App.3d at pp. 931-932.) In both situations, the employee's entire trip is considered to fall within the scope of employment. (*Ibid*.) Activities that have been held to constitute special errands include "picking up or returning tools used on the job, attendance at an employment social function when an employee's attendance is expected and it benefits the employer, and a trip in which the employee responds to a service call when the employee is on call for the employer's business. [Citation.]" (*Caldwell*, *supra*, 176 Cal.App.3d at pp. 1036-1037.)

(ii.)     *The "required vehicle" exception*

Another exception to the going and coming rule is where the employer requires that the employee use the employee's own vehicle "on the job."  (*Ducey v. Argo Sales Co*. (1979) 25 Cal.3d 707, 722–723.)  This exception is often referred to as the "required vehicle" exception.[4]  Over time, some courts have expanded the circumstances under which this exception will be deemed to apply to those situations in which the employee's use of his or her own vehicle provides a benefit to the employer, even though the employer did not explicitly *require* the employee to use his own vehicle:

> " 'A well-known exception to the going-and-coming rule arises where the use of the car gives some incidental benefit to the employer.  Thus, the key inquiry is whether there is an incidental benefit derived by the employer.  [Citation.]' [Citation.]  This exception to the going and coming rule, carved out by this court in *Huntsinger*, *supra*, 22 Cal.App.3d 803, has been referred to as the 'required-vehicle' exception.  [Citation.]  The exception can apply if the use of a personally owned vehicle is either an express or implied condition of employment [citation], or if the employee has agreed, expressly or implicitly, to make the vehicle available as an accommodation to the employer and the employer has 'reasonably come to rely upon its use and [to] expect the employee to make the vehicle available on a regular basis while still not requiring it as a condition of employment.' [Citation.]" (*Lobo*, *supra*, 182 Cal.App.4th at p. 301, italics and fn. omitted.)

---

[4]     The CACI instruction on this principle refers to it as the "vehicle-use" exception, and not the "required vehicle" exception.  (See CACI No. 3725.)  However, the instruction is phrased as follows:

> "If an employer requires an employee to drive to and from the workplace so that the vehicle is available for the employer's business, then the drive to and from work is within the scope of employment."  (CACI No. 3725.)

The theory underlying the required vehicle exception to the going and coming rule is that "when a business enterprise requires an employee to drive to and from its office in order to have his vehicle available for company business during the day, accidents on the way to and from the office are statistically certain to occur eventually, and, the business enterprise having required the driving to and from work, the risk of such accidents are risks incident to the business enterprise.' [Citation.]" (*State Farm Mut. Auto. Ins. Co. v. Haight* (1988) 205 Cal.App.3d 223, 241-242.)

c.   *Substantial departures from the employer's business*

Even if an exception to the going and coming rule applies to bring an employee's commute within the scope of employment, there are still certain circumstances under which an employee will be deemed not to be acting within the scope of employment during that commute.  In particular, if the employee substantially departs from what may fairly be deemed the employer's business, the employee will not be held to be acting within the scope of employment.  "[An] employee may yet be found outside the scope of his employment [during an otherwise covered commute] if at the time of the accident he has completely abandoned his employer's business for personal reasons.  [Citations.]  To constitute an abandonment, however, the deviation or departure from the employer's business to pursue a personal errand must be substantial and complete." (*Felix*, *supra*, 192 Cal.App.3d at p. 932.)  "A mere deviation for personal reasons will be insufficient." (*Ibid.*)

16

The distinction between an employee's substantial deviation that precludes respondeat superior liability and an employee's incidental act that permits respondeat superior liability was explored in *Lazar*, *supra*, 148 Cal.App.3d at pages 464-467. The *Lazar* court explained that the key to making this determination is whether the employee's action was foreseeable as part of the employer's business. "Categorization of an employee's action as within or outside the scope of employment . . . begins with a question of foreseeability, i.e., whether the accident is part of the inevitable toll of a lawful enterprise." (*Id.* at p. 464.) "One traditional means of defining this foreseeability is seen in the distinction between minor 'deviations' and substantial 'departures' from the employer's business. The former are deemed foreseeable and remain within the scope of employment; the latter are unforeseeable and take the employee outside the scope of his employment." (*Id.* at p. 465.)

"In determining whether an employee has completely abandoned pursuit of a business errand for pursuit of a personal objective, a variety of relevant circumstances should be considered and weighed. Such factors may include the intent of the employee, the nature, time and place of the employee's conduct, the work the employee was hired to do, the incidental acts the employer should reasonably have expected the employee to do, the amount of freedom allowed the employee in performing his duties, and the amount of time consumed in the personal activity." (*Felix*, *supra*, 192 Cal.App.3d at pp. 932-933.)

Although the question whether an employee has merely deviated from his commute or special errand or instead has substantially departed from the employer's business is typically a question of fact for a jury to determine, a court may determine that

17

an employee was acting outside the scope of the employment as a matter of law where the evidence clearly shows complete abandonment of the employer's business. (*Felix*, *supra*, 192 Cal.App.3d. at p. 933.)

B.      *Analysis*

Steward argues that summary judgment in CSU's favor was improper because there remain material questions of fact with respect to her two theories of respondeat superior liability. According to Steward, the trial court should have concluded that there remains a factual dispute as to whether the breakfast meeting had a business purpose, such that Guseman may be found to have been on his way to "work" at the time of the accident. Steward contends that if the breakfast meeting *was* work-related, then there remains an additional factual question as to whether Guseman's commute to the breakfast meeting was within the scope of Guseman's employment either because Guseman's attendance at the breakfast was a "special errand" for his employer, or because Guseman was driving a "required vehicle" at the time of the accident.

Alternatively, Steward argues that even if the trial court was correct in determining that Guseman's planned breakfast with Golich was a purely personal endeavor as a matter of law, summary judgment in CSU's favor was still improper because CSU could be held liable under the theory that Guseman was commuting to the CSUSM campus at the time he stopped for this breakfast meeting, that his commute was within the scope of his employment under the required vehicle exception, and that his stopping for breakfast that morning was merely a minor deviation from his commute.

18

We conclude that summary judgment in favor of CSU was appropriate because (1) Guseman's conduct in driving to breakfast that morning was not within the scope of his employment because the breakfast cannot fairly be deemed work-related, and he was therefore not commuting to "work" while on his way to the breakfast, and (2) even if the "required vehicle" exception applies to bring Guseman's normal commute to CSU within the scope of respondeat superior liability, Guseman's personal errand to go to the breakfast that morning was a substantial departure from his commute, such that he completely abandoned his employer's business in going to the breakfast.

1.   *No triable issue of fact exists as to whether the breakfast meeting was within the scope of Guseman's employment*

Steward contends that the trial court erred in concluding that the planned breakfast to be attended by Guseman, Golich and her husband was a personal errand, and that it did not fall within the scope of Guseman's employment as a matter of law. According to Steward, if the trial court had determined that the breakfast meeting was related to Guseman's duties as dean, then Guseman's travel to the breakfast meeting would have come within either the "special errand" exception to the going and coming rule, or the "required vehicle" exception to the going and coming rule, and CSU could thus be liable for the damages caused by Guseman's conduct. We conclude that, as a matter of law, the planned breakfast meeting was not typical of, or broadly incidental to, the enterprise that CSUSM has undertaken, and that the meeting was therefore not within the scope of Guseman's employment.

19

Steward asserts that there is "substantial evidence showing that Guseman had a work purpose for attending the breakfast meeting." In making this argument, Steward relies heavily on the idea that as an academic dean, Guseman was "not focused on accomplishing specific daily tasks" but instead, had to "develop the best policies to help the faculty accomplish their long-term research or teaching goals," and that in his capacity as dean, it was "important" for him to "exchange . . . ideas with other college administrators." Steward cites to evidence in the record showing that deans from various business colleges within the CSU system get together several times a year, and evidence that Guseman attended these meetings, as well as meetings with other business college administrators in the western United States. In support of this argument, Steward quotes Regina Eisenbach, interim dean of the College of Business Administration at CSUSM at the time the depositions in this case were taken, as stating that the "purpose of the business college deans' meetings is 'to share what's going on their campuses and help each other, provide advice.' "

Steward's apparent purpose in reciting evidence concerning meetings of academic administrators is to demonstrate that one of the purposes of Guseman and Golich's planned breakfast meeting was to "educate each other with their knowledge and experience," and that the breakfast meeting at Leann's was therefore a work-related meeting. She points out that Guseman and Golich's e-mail exchanges prior to the date of the breakfast meeting suggest that they intended to discuss "at least two major topics of importance to Guseman's CSUSM job: (a) shared governance; and (b) the potential vote

of no confidence on the Provost." Based on the content of these e-mails, she asserts, the breakfast meeting "was going to be work-related."

The evidence simply does not support the inference that Steward would have us draw. Guseman and Golich were former colleagues and friends. They socialized outside of work together because they enjoyed each others' company. When they were both working at CSUSM, they and Baldwin would meet for breakfast every month or so to discuss personal issues and things that were going on at the CSUSM campus. However, CSUSM neither required these administrators to get together for breakfast nor requested that they do so. No one at CSUSM requested that Guseman meet with Golich for breakfast on October 23, 2009. In fact, Guseman's supervisor was unaware that he planned to meet Golich for breakfast that morning.

Guseman and Golich both intended for this breakfast meeting to be "more focused on the personal things." Golich planned to ask Guseman, who was single, about his dating life, and also planned to talk about the kind of house that she and her husband were looking for. Guseman did not intend to conduct any business during the breakfast and did not have a work-related purpose in going to the breakfast. Rather, Guseman wanted to meet with Golich to have a social breakfast so that they could "catch up on" what was going on in each other's lives.

Based on the e-mail exchange between Guseman and Golich to plan the breakfast, it does appear that Guseman and Golich would likely have discussed various topics related to the goings-on at their respective workplaces. However, the evidence shows that neither Guseman nor Golich viewed the planned breakfast as a "working" meeting or

21

as a time to exchange ideas about academia or their respective institutions.  Guseman and

Golich repeatedly referred to their breakfast meeting as a time to "gossip" about what was

going on at CSUSM and at the institution at which Golich was employed.  Although they

joked about this fact, it is clear from their e-mail communications that this meeting was to

be a personal interaction—one in which they planned to catch up and gossip, as many

former colleagues and friends do—and that it was not intended to be a meeting at which

they would be exchanging ideas for the purpose of professional development.  For

example, on the day prior to the arranged meeting, Guseman checked in with Golich by

e-mail to inform her that their other friend, Baldwin, would not be able to join them, and

to ask her whether she still wanted to meet for breakfast.  In response, Golich wrote,

"Would love to. . . .  I'll even bring Doug [Golich's husband] along! . . .  [¶]  Looking

forward to seeing you and gossiping—I mean learning about how things are

going . . . .☺"  Guseman responded, "Bringing Doug would be great. I have a faculty

meeting at 10am, so to be sure [I can make it to the meeting on time] can we do 8am at

Leann's—unless there is somewhere else you would like to go.  There is lots of ~~gossiping~~

learning about what is happening here."  That the breakfast was intended to be a social

meeting and not a work-related one is further supported by the fact that Golich planned to

bring her husband along.

　　Although it seems inevitable that two former colleagues who had been friends for

many years and who plan to have breakfast together will likely discuss other mutual

friends and colleagues at their planned meeting, and that they might discuss various

topics related to their jobs, it would not be reasonable to conclude that this kind of

22

interaction is the type of activity that is even broadly incidental to the enterprise undertaken by an academic institution. The fact that friends and former colleagues may talk about the goings-on at their respective current workplaces does not turn a social encounter into a work-related meeting for which an employer may fairly be held liable for injuries caused by an employee engaged in that activity.

One of the central purposes for respondeat superior liability is "to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." (*Mary M. v. City of Los Angeles*, *supra*, 54 Cal.3d at p. 209.) Respondeat superior liability should be imposed when the loss caused by the tort of an employee is of the type that is "sure to occur in the conduct of the employer's enterprise," such that it would be fair to ask the employer to spread the risk through insurance and carry the costs as part of doing business. (*Huntsinger*, *supra*, 22 Cal.App.3d at p. 808.) We conclude that Guseman would not have been acting within the scope of his employment in attending the breakfast because the breakfast meeting between Guseman, Golich and Golich's husband was a personal errand, and was not work-related. In our view, it would be wholly *unfair* to include among the costs of CSU's business the loss that resulted from Guseman's decision to meet with a friend and former colleague for a social breakfast on the basis that they might have engaged in some conversation about CSUSM or its employees during that meeting.

2. *No triable issue of fact exists as to whether Guseman's personal errand was a substantial departure from CSUSM's business*

Steward contends that even if the breakfast meeting was a purely personal errand, Guseman's driving to Leann's that morning should be considered to fall within the scope of his employment under the "required vehicle" exception to the going and coming rule. Steward maintains that CSU may still be held liable for Guseman's acts because Guseman was en route to the breakfast meeting during the course of his commute to work, and this meeting was simply a minor deviation from his morning commute. We conclude that even if we were to assume for purposes of this appeal that Guseman's commute was within the scope of his employment under the "required vehicle" exception[5], it would not be reasonable to conclude that Guseman's planned two-hour breakfast with a friend and her husband to catch up on the latest gossip about each other's lives and the people and events on the CSUSM campus was merely a minor deviation from CSUSM's business.

CACI No. 3723 provides the instruction on substantial deviations from an employer's business. That instruction states:

> "If [an employee/a representative] combines his or her personal business with the employer's business, then the employee's conduct is within the scope of [employment/authorization] unless the [employee/representative] substantially deviates from the employer's business.

> "Deviations that do not amount to abandoning the employer's business, such as incidental personal acts, minor delays, or deviations from the most direct route, are reasonably expected and within the scope of employment.

---

[5]    We stress that we are assuming, and not deciding, that the "required vehicle" exception applies under the facts of this case.

24

"[Acts that are necessary for [an employee/a representative]'s comfort, health, and convenience while at work are within the scope of employment.]"  (CACI (2013) No. 3723.)

The "Directions for Use" of this instruction explain, in part:  "This instruction is closely related to CACI No. 3720, *Scope of Employment*.  It focuses on when an act is not within the scope of employment."

Steward contends that there is a material factual dispute regarding whether Guseman's planned breakfast with Golich and her husband was merely a minor deviation in which Guseman did not wholly abandon his employer's business (i.e., his commute).

In determining whether an employee has completely abandoned his business purpose in pursuit of a personal objective, we consider such factors as the employee's intent, the nature of, and the circumstances surrounding, the employee's conduct, the employee's work generally, the incidental acts that the employer should reasonably have expected, the freedom that the employee enjoyed, and the duration of the personal activity.  (*Felix*, *supra*, 192 Cal.App.3d 932-933.)  In this case, the breakfast meeting that Guseman planned with Golich was a complete abandonment of his business purpose in commuting to work.  The breakfast meeting is readily distinguishable from the minor personal task undertaken by the employee in *Lazar*, *supra*, 148 Cal.App.3d 458, which Steward cites in support of her claim that Guseman's conduct was a mere incidental deviation from his commute.  In *Lazar*, the court held that the doctrine of respondeat superior applied where an accident occurred while the employee was driving his employer's truck on a personal errand on his way home from work.  The uncontroverted evidence demonstrated that the employer derived a special benefit from the project

25

supervisor's commute so that the employee's driving fell within the scope of his employment. (*Id.* at p. 463.) According to the *Lazar* court, the project supervisor's personal errand—a trip to the store on his commute home from work—was "foreseeable" and therefore, was a minor deviation from the scope of his employment. (*Id.* at pp. 464-466.) The *Lazar* court explained: "While a decision to stop at a party, or a bar, or to begin a vacation, might not have been foreseeable, we can think of no conduct more predictable than an employee's stopping at a store to purchase a few items on the way home. Where, as here, the trip home is made for the benefit of the employer, in the employer's vehicle, accidents occurring during such minor and foreseeable deviations become part of the 'inevitable toll of a lawful enterprise.' " (*Id.* at p. 466.)

While an employee's personal errand to stop at a store on the way home from an employment-related commute may be deemed an incidental deviation from the employee's commute, and thus, one that an employer could reasonably expect an employee to undertake, the personal errand in this case, in contrast, was a planned two-hour social meal with a friend and that friend's husband. No employer, even one that could reasonably be expected to consider an employee's commute to fall within that employee's scope of work, could foresee that an employee might undertake such a *substantial* departure from his or her commute for a reason so unrelated to the employer's enterprise, such that the accident that Guseman caused on his way to the breakfast meeting may fairly be held to be "part of the 'inevitable toll of' " the employer's "lawful enterprise." (*Lazar*, *supra*, 148 Cal.App.3d at p. 466.)

26

Guseman's planned breakfast meeting was more akin to the employee's trip to visit his parent's home after running a special errand for his employer, as described in *Felix*, *supra*, 192 Cal.App.3d at page 933. The employee in *Felix* had been sent on a special errand to the post office by his employer at the end of his workday, just prior to the accident. The employee's journey from his place of work to the post office, and then from the post office to his home, would normally have been considered to have been within the scope of his employment. (*Ibid*.) However, instead of heading straight home after doing his business at the post office, the employee started driving from the post office toward his parents' home. The question faced by the *Felix* court on an appeal from summary judgment in favor of the employer was "whether [the employee's] clear and undisputed intent to go directly to his parents' home in Atwater from the post office constituted a complete abandonment of his employer's business." (*Ibid*.) The *Felix* court determined that such an errand constituted a complete abandonment of the employer's business, such that the employer could not be held liable for the injuries caused by its employee on his way to his parents' home. (*Ibid*.) The court concluded, "[O]nce he has delivered the mail and leaves the post office intending to drive directly to his parents' home, he has completed his employer's business and is pursuing a purely personal objective. On the facts of this case, we hold that prior to the accident in which plaintiff, John Felix, was injured, [the employee] had completed his special errand for H&H Appliances, had completely abandoned his employer's business, was pursuing a purely personal objective, and was not in the scope of his employment at the time of the accident." (*Ibid*.)

Similarly, even if Guseman's commute to work were considered to be within the scope of his employment, when Guseman made a detour from his normal commute in order to meet a friend and former colleague for breakfast, Guseman was pursuing a purely personal objective. Guseman wanted to "catch up" with Golich and her husband, and did not intend to conduct any business. The breakfast meeting cannot reasonably be deemed a simple incidental act in which Guseman was going to engage on his way to work. Rather, it was a planned two-hour meal during which Guseman intended to socialize and gossip, prior to starting his work day. Although Guseman was undoubtedly given a great deal of freedom in performing his duties as a dean, such freedom should not be so broadly construed as to turn a lengthy personal errand into an "incidental act" for which his employer must bear liability.

Under the facts of this case, we conclude that Guseman was not acting within the scope of his employment at the time of the accident, as a matter of law. Even if the "required vehicle exception" applied such that Guseman's usual commute was within the scope of his employment, he substantially departed from his commute and completely abandoned his employer's business in going to attend a breakfast meeting with a friend and former colleague, such that his employer may not be held vicariously liable under the doctrine of respondeat superior for damages resulting from the accident that Guseman caused on his way to that breakfast meeting.

IV.

DISPOSITION

The judgment is affirmed.  Costs are awarded to CSU.


                                                                    AARON, J.

I CONCUR:


McINTYRE, Acting P. J.

IRION, J., Dissenting.

Because I believe that a jury question exists as to whether the required vehicle exception to the going-and-coming rule applies in this case, I respectfully disagree with my colleagues' decision to affirm the judgment.

As the majority explains, Steward presents two separate arguments for reversal of the summary judgment. Specifically, she argues that (1) a jury could have found that Guseman's breakfast meeting with Golich had a work purpose, and thus fell within the scope of Guseman's employment and gave rise to respondeat superior liability because of the topics to be discussed and the nature of Guseman's job; and, (2) in the alternative, a jury could have found that Guseman's drive to the breakfast meeting was part of Guseman's commute to work in vehicle required for him to perform his work duties, and thus fell within the scope of his employment.

I am in complete agreement with my colleagues' analysis of the first issue. Under the undisputed evidence in the record, a reasonable jury could not find that Guseman was acting within the scope of his employment by meeting a friend and former coworker for breakfast, even when he expected that some of their discussion would cover issues related to the university that interested them both. Any other conclusion would be unfair to Guseman's employer and create an unwarranted expansion of the respondeat superior doctrine.

However, as I will explain, based on the specific facts of this case, I do not agree with my colleagues' resolution of the second issue, involving the required vehicle exception to the going-and-coming rule.

"[U]nder the 'going and coming' rule, employers are generally exempt from liability for tortious acts committed by employees while on their way to and from work because employees are said to be outside of the course and scope of employment during their daily commute. . . . [¶] 'A well-known exception to the going-and-coming rule arises *where the use of the car gives some incidental benefit to the employer. . . .* This exception to the going and coming rule . . . has been referred to as the 'required-vehicle' exception. . . . The exception can apply if the use of a personally owned vehicle is either an express or implied condition of employment . . . , or if the employee has agreed, expressly or implicitly, to make the vehicle available as an accommodation to the employer and the employer has 'reasonably come to rely upon its use and [to] expect the employee to make the vehicle available on a regular basis while still not requiring it as a condition of employment.'" (*Lobo v. Tamco* (2010) 182 Cal.App.4th 297, 301, citations omitted (*Lobo*).) "[W]hen a business enterprise requires an employee to drive to and from its office in order to have his vehicle available for company business during the day, accidents on the way to or from the office are statistically certain to occur eventually, and, the business enterprise having required the driving to and from work, the risk of such accidents are risks incident to the business enterprise." (*Huntsinger v. Glass Containers Corp.* (1972) 22 Cal.App.3d 803, 810.)

In my view, the evidence in the record is sufficient to support a jury finding that Guseman normally drove to work in a required vehicle. Specifically, the record contains evidence that an important part of Guseman's job responsibilities involved interacting with community members and that he drove his car to numerous off-campus meetings

2

and events every month, averaging 500 miles per month of job-related driving, for which he was reimbursed by his employer.  Based on those facts, a reasonable jury could find that "the employer ha[d] 'reasonably come to rely upon'" the use of Guseman's personal vehicle and to "'expect [Guseman] to make the vehicle available on a regular basis.'" (*Lobo*, *supra*, 182 Cal.App.4th at p. 301.)

When an employee is involved in an accident while driving a required vehicle, the employee's actions "may yet be found outside the scope of his employment if at the time of the accident he has completely abandoned his employer's business for personal reasons.  [Citations.]  To constitute an abandonment, however, the deviation or departure from the employer's business to pursue a personal errand must be substantial and complete.  [Citation.]  A mere deviation for personal reasons will be insufficient.  Where the employee may be deemed to be pursuing a business errand and a personal objective simultaneously, he will still be acting within the scope of his employment."  (*Felix v. Asai* (1987) 192 Cal.App.3d 926, 932 (*Felix*).)

For the purposes of assessing respondeat superior liability, the factual issue to be determined when an employee interrupts a commute in a required vehicle to attend to personal business is whether the employee's "personal errand was a foreseeable deviation from the scope of his employment, or whether evidence or inferences therefrom have been presented which would lead a jury to believe that this errand was an unforeseeable, substantial departure from his duties."  (*Lazar v. Thermal Equipment Corp.* (1983) 148 Cal.App.3d 458, 465 (*Lazar*).)  A finding on whether the employee has substantially departed from his duties in an unforeseeable manner involves consideration of several

3

factors. "Such factors may include the intent of the employee, the nature, time and place of the employee's conduct, the work the employee was hired to do, the incidental acts the employer should reasonably have expected the employee to do, the amount of freedom allowed the employee in performing his duties, and the amount of time consumed in the personal activity." (*Felix*, *supra*, 192 Cal.App.3d at pp. 932-933.)

Under this standard, courts have concluded that even when an employee interrupts his commute or course of travel to attend to personal business — such as stopping at a store or stopping for a meal — such departures could be found to be foreseeable deviations, with any torts involving the vehicle falling within the scope of employment. (*Lazar*, *supra*, 148 Cal.App.3d at p. 466 ["While a decision to stop at a party, or a bar, or to begin a vacation, might not have been foreseeable, we can think of no conduct more predictable than an employee's stopping at a store to purchase a few items on the way home."]; *Cain v. Marquez* (1939) 31 Cal.App.2d 430, 432, 442-443) [issue for the jury whether an employee was driving his vehicle within the scope of employment when heading towards work after making a stop at his parents' house to pick up tools and then making another stop for a meal]; *Gipson v. Davis Realty Co.* (1963) 215 Cal.App.2d 190, 212 [evidence supported a finding that employee was driving his vehicle within the scope of his employment when traveling to his home to eat lunch]; *State Farm Mut. Auto. Ins. Co. v. Haight* (1988) 205 Cal.App.3d 223, 228 [employee in company vehicle on way home after stopping for groceries was acting in a foreseeable manner within the scope of his employment].)

4

Taking into account all of the factors set forth in *Felix*, *supra*, 192 Cal.App.3d 926, 932-933, a reasonable juror could find that Guseman's detour for the breakfast meeting — even though made for purely personal reasons — was a foreseeable deviation during his daily commute in a required vehicle. Among other significant facts, the meeting was in the morning during commuting hours, the restaurant where Guseman planned to meet Golich was between Guseman's home and the university, Guseman intended to continue his commute to the university directly after stopping for breakfast, and Guseman did not have any set hours when he was required to be working. Under the circumstances, Guseman's employer might reasonably foresee that Guseman would stop for breakfast on the way to work while transporting the required vehicle between his home and the university.

The facts of this case fall squarely within the confines of well-established case law, cited above, holding that the required vehicle exception may be applied when an employee combines his personal errands with his commute in a required vehicle by stopping for a meal or to buy something at a store. I dissent because, in my view, the applicability of the required vehicle exception in the instant case is a factual question that should have been submitted to jury, not decided as a matter of law.

IRION, J.