Filed 3/22/13  Melman v. PDF Solutions CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| PHILIP STEVEN MELMAN, | H037703 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV158798) |
| v. | |
| PDF SOLUTIONS, INC., et al., | |
| Defendants and Respondents. | |

## I.  INTRODUCTION

Appellant Philip Steven Melman was employed by respondent PDF Solutions, Inc. (PDF) from 1998 until 2009, when he was terminated during a reduction in force from his position as vice president of investor relations and strategic initiatives.  Melman filed a wrongful termination action against PDF and its chief executive officer (CEO), respondent John Kibarian (hereafter, sometimes collectively PDF), alleging that PDF's decision to terminate him was based upon his physical disability.  His complaint included two causes of action for disability discrimination in violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.),[1] as well as causes of action for "failure to prevent discrimination," fraud, breach of contract, breach of the implied

---

[1] All further statutory references are to the Government Code unless otherwise indicated.

covenant of good faith and fair dealing, and wrongful discharge in violation of public policy.

PDF moved for summary judgment on the ground that the undisputed facts showed that Melman's employment agreement provided that his employment was at-will and he was terminated for a nondiscriminatory reason: his position was eliminated for legitimate business reasons during a reduction in force. The trial court granted the summary judgment motion, finding that Melman had failed to present evidence that created a triable issue of fact as to whether PDF's reasons for his termination were pretextual or PDF had acted with discriminatory intent. The trial court also found as a matter of law that even assuming the at-will provision in Melman's written employment agreement was modified by Kibarian's later oral statement that Melman could have the vice president position for as long as he wanted it, there was good cause for his termination due to PDF's financial condition.

On appeal, Melman contends that the trial court erred because Kibarian promised that Melman could have the vice president position for as long as he wanted it in exchange for stepping down from his prior position as chief financial officer (CFO). Melman also argues that the evidence shows that PDF used the reduction in force as a pretext and therefore a triable issue of fact exists as to whether PDF terminated his employment due to his physical disability. For the reasons stated below, we determine as a matter of law that (1) the at-will provision in Melman's employment agreement was not modified by Kibarian's later oral promise of continued employment; and (2) PDF met its burden on summary judgment to show legitimate, nondiscriminatory reasons for terminating his at-will employment. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 357 (*Guz*).) We also determine that Melman produced no evidence from which it could be reasonably inferred that PDF terminated his employment on the basis of his physical disability. (*Id*. at p. 360.) Therefore, we will affirm the judgment in PDF's favor.

## II.  FACTUAL BACKGROUND

Our factual summary is drawn from the parties' separate statements of fact and the evidence they submitted in connection with PDF's motion for summary judgment.

### A.  *The Employment Agreement*

Melman was employed as the CFO of PDF between 1998 and 2006.  He executed an employment agreement dated July 9, 1998, that included the following at-will provision:  "At-Will Employment.  By signing below, you acknowledge that your employment at the Company is for an unspecified duration, and neither this letter nor your acceptance thereof constitutes a contract of employment.  You acknowledge that your employment will be on an 'at-will' basis, which means that the employment relationship may be terminated by you or the Company at any time for any reason or no reason, without further obligation or liability."

The July 9, 1998 agreement also included the following clause regarding modifications:  "This letter, together with the Confidentiality Agreement, set forth the terms of your employment with the Company and supersedes any prior representations or any agreements, whether written or oral.  This letter may not be modified or amended except by a written agreement, signed by the Company and by you."

Melman's employment agreement was amended twice, on December 29, 2008, and March 18, 2009.  Melman executed both amendments, which included revisions only to the severance pay and benefits provisions.  The December 29, 2008 amendment expressly stated, "Except as otherwise amended in this letter agreement, the Offer Letter remains in full force and effect."  The March 18, 2009 amendment similarly stated, "All other terms of the Amended Offer remain unchanged."

### B.  *Melman's Employment History with PDF*

In 1999, Melman learned that he had multiple sclerosis.  He continued to be employed as the CFO of PDF, where his achievements included taking the company public with an initial public offering in 2001.  In approximately 2002, Melman told

Kibarian, PDF's CEO, that he had multiple sclerosis. In July 2005 Melman informed Kibarian that his multiple sclerosis was getting worse and he was not sure how long he could do his job. By that time, Melman had hired Keith Jones as his "number 2" in PDF's finance department with the idea that Jones would be his replacement.

Sometime in 2005, Jones accepted an offer of employment from another company. Melman encouraged Jones to retract his acceptance and remain at PDF. In September or October of 2005, Melman proposed to Kibarian that Jones assume Melman's position as CFO. Melman's decision to step down as CFO was "purely voluntary." Melman sent an email to Kibarian in October 2005 stating, "Basically, I need to hire my replacement with the idea that he/she does [Keith Jones's] job until we can transition smoothly— considering my health recently, I figure . . . 1 year. I just can't keep up the pace I've kept for the last 30 years. I need to slow down."

PDF offered the CFO position to Jones, which he accepted on October 12, 2005. Melman then discussed the creation of his new title and position with Kibarian. Melman recalled, as stated in his declaration, that "[w]e both knew I would continue doing much of the same work I was doing but the goal was to also mentor Jones, make him a success, help Wall Street understand there was no problem in finance, and create a title that would cover a lot of territory. We picked VP of Investor Relations and Strategic Initiatives to cover all bases." In his newly created position of vice president of investor relations and strategic initiatives, effective January 2006, Melman received an increase in his annual salary from $200,000 to $205,000. Later, Melman began to worry about his "quick decision to give up" the CFO position and his ability to find a comparable position if "something went sideways at PDF."

At an executive staff meeting held in mid-December 2005, Kibarian announced Melman's transition from CFO to vice president of investor relations and strategic initiatives. Melman recalls, as he noted in his declaration, that Kibarian stated during the meeting that "[Melman] can have this position for as long as he wants it." Upon hearing

4

Kibarian's statement, Melman "was touched and immediately relieved of [his] concerns." In his deposition testimony, Melman admitted that he had agreed to make the transition from CFO to vice president before Kibarian stated at the executive staff meeting that Melman could have the vice president position for as long as he wanted it, and he did not rely upon Kibarian's statement in deciding to step down as CFO.

On December 19, 2005, Kibarian sent an email to all PDF employees announcing the appointment of Jones as CFO and Melman's appointment as vice president of investor relations and strategic initiatives. In the email, Kibarian complimented Melman for "being more public about his personal situation and . . . signal[ing] to the investor community that this change [was] solely due to a medical situation." Melman did not believe there was anything discriminatory about Kibarian's December 2005 email. In February 2006 Melman sent an email to Kibarian in which he stated that, "You, the Board and the company have been very supportive of my personal health situation . . . ." PDF had accommodated Melman's health situation by, among other things, setting up a home office for him. Melman acknowledges that "PDF provided him with reasonable accommodations . . . at least until September 21, 2008, if not April 14, 2009."

In 2007 and 2008, as Kibarian stated in his deposition testimony, members of PDF's board of directors expressed concerns about Melman's effectiveness as vice president of investor relations and strategic initiatives. In particular, the board was concerned about Melman's ability to communicate effectively with investors and his involvement in certain financial tasks although he was not in the finance department and did not report to the CFO. Melman was aware, as he acknowledged in his deposition testimony, that the board had communicated through Kibarian or Jones that his presentations to investors were not "good enough."

By February 2008, Melman knew that PDF's stock price was dropping. As the stock price continued to drop between February 2008 and April 2008 and the company was about to lay off employees, Melman communicated to Kibarian his desire that

5

executive pay and compensation be increased. Melman was particularly concerned that Jones would leave the company, although Jones had never told Melman that he would leave if he did not get a pay increase. Jones later met with Kibarian and told him that Melman did not speak for him. Additionally, during an April 2008 meeting with Kibarian, Melman suggested that one of the options for PDF's future was to sell the company.

Kibarian began to lose confidence in Melman as a result of Melman's statements in April 2008, which he perceived as "motivated by greed and avarice." At that time, Melman also had business disagreements with some board members and company executives.

Melman stated in his deposition testimony that he was not subjected to any discriminatory treatment before July 2008, when PDF hired Joy Leo as chief administrative officer (CAO). Although PDF had announced that Leo's responsibilities included investor relations, Melman continued to report to Kibarian. Melman believed that Leo had a board-driven agenda that put his position at risk, along with the positions of Jones and another executive, David Joseph. Jones later told Melman that Leo had asked Jones if a "restructuring accrual" had been established to "deal with Melman's termination."

According to Melman, 80 percent of his work in the vice president position was finance and 20 percent was investor relations. Between January 2008 and the end of June 2008, Melman spent about 80 hours per quarter on investor relations work. From July 2008 to December 2008, Melman spent less time on investor relations, approximately 40 hours per quarter. In September 2008, the president of PDF's Japanese subsidiary raised an issue regarding the accuracy of the timecard irregularity reports for which Melman was responsible. At the end of September 2008, Steve Heinrichs, a board member and chair of the audit committee, instructed Jones to remove Melman's finance-related duties and to have those duties performed in the finance department.

6

After PDF's controller left in September 2008, Jones, who had continued in the CFO position, recommended that Melman be given the controller position and that he report to Jones. Leo, the CAO, did not accept the recommendation because she felt that board member Heinrichs would object, and Melman was not appointed to the controller position.

## C. *Termination of Melman's Employment*

PDF's first reduction in force took place in April 2008. The second reduction in force began in the fall of 2008. By the end of 2009, PDF had laid off 103 employees and reduced its "global headcount" by approximately 25 percent.

In December 2008, Kibarian and Melman had a meeting in which Melman offered to "relieve the pressure on [Kibarian] to cut some costs" by contracting to work through 2010 at a reduced salary in exchange for an increase in his PDF stock options from 150,000 to 400,000. Kibarian then delegated the negotiations with Melman to Leo. On January 12, 2009, Leo told Melman that his proposal was not acceptable and that he would be laid off. Kibarian told Melman in February 2009 that PDF could no longer afford the position of vice president of investor relations.

In March 2009, Kibarian offered Melman employment through December 31, 2009, at his current salary plus 30,000 shares of PDF. Melman did not respond to the offer. Thereafter, on April 14, 2009, PDF notified Melman that his position of vice president of investor relations and strategic initiatives was being eliminated as part of a reduction in force and his employment would be terminated as of April 28, 2009. At Melman's request, Kibarian extended his termination date to May 15, 2009, so that Melman could take a preplanned family vacation. Kibarian also told Melman that " 'between the time you come back from your vacation and May 15, I'd like to negotiate an arrangement with you that's satisfactory.' "

The record reflects that no further negotiations between PDF and Melman took place. After his termination date was extended, Melman complained to Jones that he

"was suffering from disability discrimination at the hands of [board member] Steve Heinrichs and others." PDF hired an independent investigator to investigate Melman's claims of disability discrimination. Melman refused to meet with the investigator. After the investigation was concluded, PDF determined that Melman's complaint of disability discrimination had no basis and formally terminated his employment effective September 2, 2009.

Melman asserts that he was the "only high-ranking PDF executive to be terminated via reduction in force." PDF states that another vice president was terminated in the August 2009 reduction in force. After Melman's termination, another company employee stated in a declaration that she had resigned from PDF because Leo made derogatory comments about that employee's race.

### III. PROCEDURAL BACKGROUND

#### A. *The Complaint*

In December 2009, Melman filed a verified complaint naming PDF and Kibarian as defendants. In the first cause of action for disability discrimination (wrongful termination) and the second cause of action for disability discrimination (disparate treatment), Melman alleged that PDF was "substantially motivated by Melman's disability when it terminated his employment" in violation of the FEHA, section 12940 et seq. In the third cause of action for "failure to prevent discrimination," Melman alleged that PDF had "failed to take reasonable steps to prevent PDF directors and officers from discriminating against [him] because of his disability, causing [him] to suffer demotion and termination" in violation of section 12940 et seq.

In the fourth cause of action for fraud, Melman claimed that defendants had "induced [him] to resign and publicly announce his disabled condition" by declaring that they intended to provide him with employment " 'for as long as he wants to keep it.' " In the fifth cause of action for breach of contract, Melman alleged that PDF breached the contract created by its promise to provide him with employment " 'for as long as he

8

wants to keep it' " when it terminated his employment in September 2009. The sixth cause of action was for breach of the implied covenant of good faith and fair dealing.

In the seventh cause of action for wrongful discharge in violation of public policy, Melman alleged that PDF's decision to terminate him was substantially motivated by his disability and thus constituted a violation of public policy under the FEHA.

**B.** *The Motion for Summary Judgment*

PDF filed a motion for summary judgment, or, in the alternative, summary adjudication, arguing that all of Melman's claims lacked merit as a matter of law.

In its points and authorities, PDF argued that the first, second, third and seventh causes of action, which were all based on Melman's allegations of disability discrimination, lacked merit because the evidence showed that he had voluntarily stepped down from the CFO position; he was terminated from the position of vice president of investor relations and strategic initiatives for economic reasons after PDF's stock price plummeted and the company could no longer afford a stand-alone position for investor relations; and his finance duties were transferred due to concerns about finance functions being handled by a person outside the finance department.

PDF also argued that Melman had provided no evidence from which it could be reasonably inferred that the company's stated reasons for his termination were a pretext for disability discrimination. Additionally, PDF argued that since as a matter of law Melman could not state a claim for disability discrimination, he also could not state a claim for failure to prevent discrimination.

Alternatively, PDF argued that Melman's disability discrimination claims failed because he was not a qualified disabled person within the meaning of FEHA (since he claimed he was not able to work due to his disability) and also because he had not timely served PDF with his Department of Fair Employment and Housing (DFEH) complaint.

As to the fourth cause of action for fraud, the fifth cause of action for breach of contract, and the sixth cause of action for breach of the covenant of good faith and fair

9

dealing, PDF contended that those claims also lacked merit as a matter of law. PDF maintained that even assuming that Kibarian had orally promised Melman that he could have the vice president position for as long as he wanted it, the at-will provision in the parties' written integrated employment agreement could not be modified by an oral statement; the claim for breach of the covenant of good faith and fair dealing necessarily failed in the absence of a breach of contract; and the fraud claim failed because Melman did not and could not reasonably rely upon Kibarian's oral promise when he voluntarily stepped down from the CFO position.

### C. *Opposition to the Motion for Summary Judgment*

Melman argued that he had submitted sufficient admissible evidence to create triable issues of fact that precluded summary judgment.

Regarding the causes of action arising from his claim of disability discrimination, Melman contended that the evidence showed that PDF had targeted Melman for termination after his public announcement of his disability and the decision to terminate his employment was substantially motivated by his disability, particularly since he was the only executive to be terminated "via reduction in force." Melman also contended that the evidence showed that PDF's reasons for terminating his employment were a pretext for disability discrimination, since (1) his finance-related tasks were taken away by board member Heinrichs although the company's auditors did not require that those tasks be performed in the finance department; (2) his timecard reporting irregularities were minor and easily resolved; and (3) Leo and Kibarian refused to consider him for the controller position for which he was "eminently qualified" because Heinrichs would be upset.

Additionally, Melman argued that PDF had failed to accommodate his disability when it refused to consider him for the controller position and had also failed to engage in a good faith, interactive process regarding the controller position. Melman claimed that PDF "had a duty to honor Melman's request for reassignment when the position of

10

Controller became available." Melman also stated that he timely served his DFEH complaint on PDF's attorneys during discovery in this case.

As to the causes of action for breach of contract and breach of the covenant of good faith and fair dealing, Melman asserted that a contract was created when he promised to step down from the CFO position in exchange for Kibarian's promise that he would be employed in the vice president position for as long as he wanted it. According to Melman, he fulfilled his part of the contract by stepping down and publicly announcing his disability.

Finally, Melman argued that his fraud claim has merit because the evidence showed that Kibarian had fraudulently induced him to step down from the CFO position by promising that he could stay in the vice president position for as long as he wanted it.

**D. *The Trial Court's Order***

In its order of August 15, 2011, the trial court granted PDF's motion for summary judgment.

Regarding Melman's claims of disability discrimination, the trial court found the following facts were undisputed: (1) Melman voluntarily stepped down from the CFO position because his health was deteriorating; (2) after he stepped down, he received a raise; (3) his finance duties were transferred to the finance department due to legitimate business concerns in October 2008; and (4) PDF had to lay off approximately 25 percent of its workforce due to the economic crisis. Noting that it has been held that a reduction in force is a legitimate reason to terminate an employee, the trial court ruled that "[i]n light of Defendants' evidence, Defendants have met their initial burden of showing that Plaintiff was laid off for economic reasons and that his responsibilities as Vice President of Investor Relations and Strategic Initiatives were modified due to legitimate business concerns."

The trial court further found that "there is no evidence with which the jury could draw an inference that PDF's decision to terminate Plaintiff or remove his finance-related

11

duties was based on his disability." Additionally, the court found that "[t]here is also no evidence that Plaintiff was not considered for the open Controller position *because of his disability*. Plaintiff only provides evidence that he was not allowed to apply for the Controller position because Heinrichs would be upset." The court noted that it has been held that "[e]ven '[a] personal grudge can constitute a "legitimate, nondiscriminatory reason" for an adverse employment decision.' [Citation.]"

Having made these findings, the trial court determined that Melman's "allegations of disability discrimination are mere speculation." The court accordingly found that the discrimination-related causes of action lacked merit as a matter of law.

The trial court also determined that the contract causes of action lacked merit as a matter of law, finding that defendants had shown that the at-will provision in Melman's employment agreement could only be modified by a written agreement, and, in any event, defendants had shown that there was good cause for Melman's termination "due to the depressed financial condition of PDF."

As to the fraud cause of action, the trial court found that Melman's claim that he had relied on Kibarian's promise of continued employment in deciding to step down as CFO was not supported by any evidence that Melman had relied on the promise to his detriment, since he had not provided "any evidence that his responsibilities were taken away because of his announcement or that he was terminated because of his announcement."

The trial court also made a number of rulings regarding the parties' evidentiary objections. The only ruling at issue in this appeal is the order sustaining PDF's objection to the handwritten investigator's notes submitted by Melman.

Judgment in PDF's favor was entered in October 2011 and judgment in Kibarian's favor was entered in November 2011. An amended judgment in PDF's favor that includes costs was entered in January 2012. Melman filed a timely notice of appeal.

12

## IV. DISCUSSION

On appeal, Melman contends that the trial court erred in granting PDF's motion for summary judgment since triable issues of fact exist as to all causes of action. Before addressing Melman's contentions, we will outline the applicable standard of review.

### A. *The Standard of Review*

The standard of review for an order granting a motion for summary judgment is de novo. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 (*Aguilar*).) The trial court's stated reasons for granting summary judgment are not binding on the reviewing court, "which reviews the trial court's ruling, not its rationale. [Citation.]" (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 498.)

In performing our independent review, we apply the same three-step process as the trial court. "Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought." (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 (*Baptist*).)

"We then examine the moving party's motion, including the evidence offered in support of the motion." (*Baptist*, *supra*, 143 Cal.App.4th at p. 159.) A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o); *Aguilar, supra*, 25 Cal.4th at p. 850.)

If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 849.)

In determining whether the parties have met their respective burdens, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar, supra*, 25 Cal.4th at p. 843.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.) Thus, a party " 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145.)

**B.** *Causes of Action Arising from Disability Discrimination*

We will begin our independent evaluation of the merits of PDF's motion for summary adjudication of the first cause of action for disability discrimination (wrongful termination), the second cause of action for disability discrimination (disparate treatment), the third cause of action for "failure to prevent discrimination," and the seventh cause of action for wrongful discharge in violation of public policy, with a brief overview of the legal framework governing summary adjudication of an employee's claim for disability discrimination.

**1. The Legal Framework for a Disability Discrimination Claim**

California has adopted the three-stage, burden-shifting test known as the *McDonnell Douglas* test (*McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792) for determining the merits of a discrimination claim, including a claim for disability discrimination. (*Guz, supra,* 24 Cal.4th at p. 354; *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2 (*Reid*).)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination." (*Guz, supra*, 24 Cal.4th at p. 354.) In

14

general, the elements of a prima facie case of discrimination are (1) the plaintiff was a member of a protected class; (2) the plaintiff was qualified for the position sought or performed competently; (3) the plaintiff suffered an adverse employment action, such as termination; and (4) "some other circumstance suggests discriminatory motive. [Citations.]" (*Id.* at p. 355.) "If, at trial, the plaintiff establishes a prima facie case, a presumption of discrimination arises. [Citations.]" (*Ibid*.)

If the plaintiff makes the required prima facie showing at trial, the burden shifts to the employer to produce admissible evidence sufficient to show a legitimate, nondiscriminatory reason for the adverse employment action. (*Guz*, *supra*, 24 Cal.4th at pp. 355-356.) "If the employer meets this burden, the employee then must show that the employer's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination. [Citation.]" (*Reid*, *supra*, 50 Cal.4th at p. 520, fn. 2.)

With respect to summary adjudication of a discrimination claim, this court has stated that an employer seeking summary judgment in a discrimination case may meet its burden by showing that one or more of the elements of a prima facie case are lacking or that the adverse employment action was based on a legitimate, nondiscriminatory reason. (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038 (*Cucuzza*).)

If the employer meets its initial burden in moving for summary judgment, the burden then shifts to the employee to "demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory *animus*, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action. [Citations.]" (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1038.)

In *Guz*, the California Supreme Court emphasized that "the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was

15

discriminatory." (*Guz*, *supra*, 24 Cal.4th at p. 361, fn. omitted.) "[A]n inference is reasonable if, and only if, it implies the unlawful motive is more likely than defendant's proffered explanation. [Citation.]" (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1038.) Speculation regarding the employer's unlawful motive in terminating the employee is insufficient to raise a triable question of fact regarding whether the employer's explanation was pretextual or false. (*Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1735 (*Martin*).)

Having reviewed the legal framework for summary adjudication of an employee's claim of disability discrimination and the applicable standard of review, we turn to our evaluation of PDF's motion for summary adjudication of the causes of action arising from Melman's claim of disability discrimination.

### 2. Analysis

To determine whether PDF met its initial burden to show on undisputed facts that the termination of Melman's employment was based on a legitimate, nondiscriminatory reason (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1038), we first examine the undisputed material facts, as presented in PDF's motion for summary judgment, as follows.

In 2002, Melman told Kibarian, PDF's CEO, that he had multiple sclerosis. Melman voluntarily stepped down from the CFO position in 2005 after informing Kibarian that his multiple sclerosis was getting worse and he was not sure how long he could do his job. Melman and Kibarian together created a new position for Melman of vice president of investor relations and strategic initiatives, effective January 2006.

In 2007 and 2008, board members had become concerned about Melman's effectiveness as vice president of investor relations. PDF's stock price began to decline in 2008 and the company started laying off employees. During that time period, Melman nevertheless asked for increases in executive pay and compensation and suggested that the company be sold. Kibarian then began to lose confidence in Melman due to his perceived greed.

16

Melman admits that PDF accommodated him by setting up his home office and he was not subjected to any discriminatory treatment before July 2008. In September 2008, there was an issue with time card irregularities for which Melman was responsible. Also in September 2008, board member Heinrichs instructed that Melman's finance-related tasks be removed and performed in the finance department.

PDF conducted reductions in force beginning in 2008 that ultimately reduced the company's workforce by 25 percent. In December 2008, Melman voluntarily began negotiations with PDF to end his employment in exchange for an increase in his PDF stock options. Those negotiations failed and Kibarian told Melman in February 2009 that PDF could no longer afford his vice president position. Melman did not respond to Kibarian's March 2009 offer of employment through December 31, 2009, at his current salary plus 30,000 shares of PDF. PDF then notified Melman that his vice president position was being eliminated as part of a reduction in force and his employment would be terminated in April 2009.

At Melman's request, Kibarian extended Melman's termination date to May 15, 2009. Melman then complained that he was suffering from disability discrimination and PDF hired an independent investigator to investigate his claims. As a result of the investigation, PDF concluded that Melman's claims of disability discrimination had no basis and terminated his employment as of September 2, 2009.

Based on these undisputed facts, we find that PDF's nondiscriminatory business reason for eliminating Melman's position as vice president of investor relations and strategic initiatives and terminating his employment during a reduction in force of 25 percent of the company's employees "was creditable on its face." (*Guz, supra*, 24 Cal.4th at p. 357.) Melman therefore "had the burden to *rebut* this facially dispositive showing by pointing to evidence which nonetheless raises a rational inference that intentional discrimination occurred. [Citation.]" (*Ibid.*)

On appeal, Melman claims that he met his burden to provide evidence from which it could be reasonably inferred that PDF intentionally discriminated against him due to his physical disability, as follows. When Leo was appointed CAO, she inquired as to whether a "restructuring accrual" had been established to "deal with Melman's termination." Board member Heinrichs removed Melman's finance-related duties with the false justification that the company's auditors required those duties to be performed in the finance department, and by doing so, "breached the PDF organizational structure." Leo, who has a history of discriminatory conduct and who lacked credibility, "precluded" Melman from applying for the vacant controller position although he had superior qualifications. Melman also asserts that he was the only executive to be terminated due to a reduction in force.

Based on this showing, Melman contends that triable issues of fact exist as to whether PDF terminated his employment due to disability discrimination, and therefore the trial court erred in granting summary adjudication of the first and second causes of action for disability discrimination, the third cause of action for failure to prevent discrimination, and seventh causes of action for wrongful discharge in violation of public policy.

We are not convinced that Melman's showing is sufficient to create a triable issue of fact as to whether PDF's true reason for terminating him was disability discrimination. The California Supreme Court instructed in *Guz* that "summary judgment for the employer may . . . be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred." (*Guz*, *supra*, 24 Cal.4th at p. 362.)

In *Guz*, the plaintiff employee alleged that he had been terminated by his employer due to age discrimination. (*Guz*, *supra*, 24 Cal.4th at p. 357.) The defendant employer, Bechtel National, Inc. (Bechtel), moved for summary judgment on the ground that Guz

18

was terminated for reasons unrelated to age bias during a company reorganization. (*Id*. at pp. 359-360.) Although Guz argued that the evidence raised a triable issue of fact as to whether Bechtel's proffered reasons for his termination were false, our Supreme Court determined that "the record contains no direct evidence, and little if any circumstantial support, for such a finding." (*Id*. at p. 363.) The court concluded, "[i]n sum, even without considering Bechtel's explanation, Guz's evidence raised, at best, only a weak suspicion that discrimination was a likely basis for his release. Against that evidence, Bechtel has presented a plausible, and largely uncontradicted, explanation that it eliminated [Guz's business unit], and chose others over Guz, for reasons unrelated to age. . . . [¶] Under these circumstances we conclude, as a matter of law, that Guz has failed to point to evidence raising a triable issue that Bechtel's proffered reasons for its actions were a pretext for prohibited age discrimination." (*Id*. at pp. 369-370; see also *Cucuzza*, *supra*, 104 Cal.App.4th at pp. 1045-1046 [no reasonable fact finder could infer that the plaintiff employee's gender was part of the employer's decision to hire another for the permanent position she sought].)

The present case is similar to *Guz* and *Cucuzza*. PDF presented a plausible and largely uncontradicted explanation for its termination of Melman's employment: (1) Melman's position of vice president of investor relations and strategic initiatives, which was specially created for him after he voluntarily stepped down from the CFO position at his request, was eliminated during a reduction in force—in which 25 percent of PDF's workforce was laid off—because PDF could no longer afford Melman's position; and (2) Melman was laid off after the parties' mutual efforts to negotiate his voluntary departure from the company had failed. Moreover, as in *Guz*, "even without considering [PDF's] explanation, [Melman's] evidence raised, at best, only a weak suspicion that discrimination was a likely basis for his release." (*Guz*, *supra*, 24 Cal.4th at pp. 369-370.)

We recognize that "[i]n discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence." (*Cucuzza*, *supra*, 104 Cal.App.4th at p. 1038.) However, "even though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of [the employer's] motive, a material triable controversy is not established unless the inference is reasonable. And an inference is reasonable if, and only if, it implies the unlawful motive is more likely than defendant's proffered explanation. [Citation.]" (*Ibid.*)

Here, Melman's showing is too weak to support a reasonable inference that it is more likely that PDF terminated him due to his physical disability, rather than for PDF's proffered explanation that he was terminated for business reasons when his position was eliminated during reduction in force. Although Melman's evidentiary showing may be sufficient to draw an inference that board member Heinrichs and CEO Kibarian were dissatisfied with Melman and wanted him to leave the company, his showing was insufficient to create more than speculation that they had a discriminatory motive. As we have noted, speculation regarding an employer's motive for terminating an employee is insufficient to raise a triable issue of fact regarding whether the employer's showing was pretextual or false. (*Martin*, *supra*, 29 Cal.App.4th at p. 1735.) And, although Melman asserts that Leo engaged in racial discrimination, even assuming that an inference of disability discrimination may be drawn from evidence of racial discrimination, there is no evidence that Leo authorized the termination of Melman's employment.

Finally, Melman argues that a triable issue of material fact exists as to whether "PDF unlawfully withdrew reasonable accommodations for his disability" when Leo precluded him from applying for the vacant controller position. We observe that the complaint does not include a causes of action for failure to accommodate. " 'The complaint serves to delimit the scope of the issues before the court on a motion for summary judgment [citation], and a party cannot successfully resist summary judgment

20

on a theory not pleaded.' [Citation.]" (*Bosetti v. United States Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1225.)  Thus, an "appellant may not defeat a summary judgment motion by producing evidence to support claims that are outside the issues framed by the pleadings.  [Citations.]" (*Vournas v. Fidelity Nat. Tit. Ins. Co.* (1999) 73 Cal.App.4th 668, 674, fn. 6.)  Even assuming that Melman has sufficiently pleaded a cause of action for failure to accommodate, we determine that the claim lacks merit as a matter of law since there is no evidence that Melman ever requested assignment to the controller position as a reasonable accommodation of his physical disability.  (See *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013 [burden is on the employee to suggest a reasonable accommodation under section 12940, subdivision (n)].)

Although we acknowledge that "sadly, economically dictated reductions in force can and often do victimize highly qualified and hard-working people" (*Martin*, *supra*, 29 Cal.App.4th at p. 1733), we conclude that in the absence of a triable issue of material fact regarding whether PDF acted with a discriminatory motive, the trial court did not err in granting PDF's motion for summary adjudication of the first cause of action for disability discrimination (wrongful termination), the second cause of action for disability discrimination (disparate treatment), the third cause of action for "failure to prevent discrimination," and the seventh cause of action for wrongful discharge in violation of public policy.

Having reached this conclusion, we need not address PDF's contentions that summary judgment was proper because Melman is not a qualified person under the FEHA and he failed to timely serve his DFEH complaint.

## C. *Contract Causes of Action*

In the fifth cause of action for breach of contract, Melman alleged that PDF breached the contract it had created by its promise to provide him with employment " 'for as long as he wants to keep it' " when it terminated his employment in September 2009.

21

The sixth cause of action asserts breach of the implied covenant of good faith and fair dealing. Melman contends that the trial court erred in granting summary adjudication of both causes of action because the evidence shows that he and Kibarian "entered into an oral agreement, by which Melman promised to step down as CFO and publicly announce his medical condition to Wall Street as the cause of the transition, and in return Kibarian promised to employ Melman in a lower-ranked Vice President position for as long as Melman wanted."

PDF responds that as a matter of law, Kibarian's oral statement could not modify the at-will provision in Melman's employment agreement. It is undisputed that Melman's employment agreement included the following at-will provision: "<u>At-Will Employment.</u> By signing below, you acknowledge that your employment at the Company is for an unspecified duration, and neither this letter nor your acceptance thereof constitutes a contract of employment. You acknowledge that your employment will be on an '<u>at-will</u>' basis, which means that the employment relationship may be terminated by you or the Company at any time for any reason or no reason, without further obligation or liability."

The California Supreme Court has defined at-will employment: " 'An at-will employment may be ended by either party "at any time without cause," for any or no reason, and subject to no procedure except the statutory requirement of notice.' [Citation.]" (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 392.) Where there is a valid integrated contract creating at-will employment, it cannot be contradicted or defeated by evidence of an oral agreement purporting to guarantee employment for a certain period of time or upon the occurrence of certain conditions. (*Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 37-38 (*Starzynski*).) The express at-will provision controls because there cannot be a valid express contract and an oral side agreement that each embrace the same subject but require different results. (*Ibid.*; *Camp*

22

*v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 630; *Slivinsky v. Watkins-Johnson Co.* (1990) 221 Cal.App.3d 799, 806 (*Slivinsky*).)

Melman's employment agreement also expressly provided that the agreement could "not be modified or amended except by a written agreement, signed by the Company and by you." This court has ruled that where, as here, the employment agreement includes an at-will provision and expressly states that the agreement may be modified only by a formal written agreement, no contract implied from subsequent oral statements or conduct can modify the at-will provision. (*Haggard v. Kimberly Quality Care, Inc.* (1995) 39 Cal.App. 508, 521; see also *Starzynski*, *supra*, 88 Cal.App.4th at p. 38 [supervisor's oral assurance of continued employment did not create implied contract in face of written acknowledgment signed by employee that employment was at-will].) As a matter of law, therefore, Kibarian's oral statement that Melman could have the vice president position for as long as he wanted it did not modify the at-will provision in Melman's written employment agreement.[2]

Melman's alternative argument is that PDF is estopped from denying an implied contract because he "relied on Kibarian's [oral] promise before abandoning his CFO position and publicly disclosing his [multiple sclerosis]." We find no merit in this

---

[2] At oral argument, we requested the parties to submit supplemental briefing on the California Supreme Court's decision the day before in *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169 (*Riverisland*).) In *Riverisland*, the court overruled its prior decision in *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258 and instructed that the fraud exception to the parole evidence rule, codified at Code of Civil Procedure section 1856, subdivision (f), "broadly permits evidence relevant to the validity of an agreement and specifically allows evidence of fraud." (*Riverisland*, *supra*, at p. 1175.) The court further ruled that Code of Civil Procedure section 1856, subdivision (f) "rests on the principle that the parol evidence rule, intended to protect the *terms* of a valid written contract, should not bar evidence challenging the *validity* of the agreement itself." (*Id*. at p. 1174.) Since the issues in the present case concern the terms of Melman's employment agreement, not the validity of the agreement itself, the decision in *Riverisland* is not applicable here.

23

argument because it is undisputed, as Melman testified in his deposition, that he had agreed to make the transition from CFO to vice president before Kibarian stated at the executive staff meeting that Melman could have the vice president position for as long as he wanted it, and Melman did not rely upon Kibarian's statement in deciding to step down as CFO.

Since we have determined as a matter of law that the at-will provision in Melman's employment contract was not modified by Kibarian's subsequent oral statement that Melman could have the vice president position for as long as he wanted it, we also determine that the fifth cause of action for breach of contract lacks merit as a matter of law and the trial court properly granted summary adjudication.

For the same reason, the sixth cause of action for breach of the implied covenant of good faith and fair dealing also fails as a matter of law. "The covenant is designed to effectuate the intentions and reasonable expectations of parties reflected by mutual promises within the contract. [Citation.] Here the parties agreed that their relationship was terminated at will. Therefore, 'terminating an employee without good cause does not deprive the employee of the benefits of the agreement.' [Citations.]" (*Silivinsky*, *supra*, 221 Cal.App.3d at p. 806.)

### D. *Fraud Cause of Action*

Melman contends that triable questions of material fact preclude summary adjudication of the fourth cause of action for fraud, in which he alleged that defendants had fraudulently induced him "to resign and publicly announce his disabled condition" by declaring that they intended to provide him with employment " 'for as long as he wants to keep it.' " According to Melman, the evidence shows that Kibarian knew that his promise that Melman could have the vice president position for as long as he wanted it was false and Kibarian intended to induce Melman's reliance on the false promise of continued employment.

PDF responds that Melman cannot establish the elements of a cause of action for fraud, since, among other things, it is undisputed that Melman did not rely on Kibarian's promise when he voluntarily stepped down from the CFO position prior to the promise being made. We agree.

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.] [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) "[P]romissory fraud, like all forms of fraud, requires a showing of justifiable reliance on the defendant's representation. [Citation.]" (*Riverisland*, *supra*, 55 Cal.4th at p. 1183.)

We determine that Melman cannot demonstrate a triable factual issue regarding the element of justifiable reliance in his fraud cause of action. In *Slivinsky*, *supra,* 221 Cal.App.3d 799, this court granted the employer's summary judgment motion in a wrongful termination action on the basis of a written at-will agreement. In addition to breach of contract and breach of the implied covenant of good faith and fair dealing, the plaintiff employee had also alleged fraud. This court found that the plaintiff's reliance on the employer's promises of continuing employment was "simply not justifiable because the representations contradict the parties' integrated employment agreement which provided that the employment was at will. [Citations.] Justifiable reliance is a necessary element of a cause of action for fraud. [Citation.]" (*Id.* at p. 807; see also *Shapiro v. Wells Fargo Realty Advisors* (1984) 152 Cal.App.3d 467, 482 [employee cannot reasonably rely on promise in conflict with at-will provision], disapproved on another point in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 667.)

25

Similarly, as a matter of law Melman could not justifiably rely on Kibarian's oral promise of continued employment since that promise conflicted with the at-will provision in his integrated employment agreement. Summary adjudication of the fraud cause of action was therefore proper.

## E. *Evidentiary Ruling*

Finally, Melman argues that the trial court abused its discretion in sustaining PDF's evidentiary objection to the independent investigator's handwritten interview notes, which Melman asserts shows that several board members wanted to fire him and were therefore admissible as "nonhearsay statements evidencing the mental state of the declarants," as well as party admissions and prior inconsistent statements.

According to PDF, the trial court properly sustained the evidentiary objection to the investigator's notes on the grounds of inadmissible multiple hearsay, lack of personal knowledge, and lack of authentication.

The standard of review for for a trial court's evidentiary rulings is abuse of discretion. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281.) However, we need not determine whether the trial court abused its discretion in excluding the investigator's notes because Melman has not shown that the claimed error was prejudicial. " 'Anyone who seeks an appeal to predicate a reversal of [a judgment] on error must show that it was prejudicial. (Cal. Const., art. VI, § 13.)' [Citation.]" (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694 [plaintiff challenging summary judgment failed to show she was prejudiced by the trial court's adoption of evidentiary rulings proposed by defendant's attorneys].)

According to Melman, the investigator's notes include the following statements: "(1) PDF Board Chairman Lucio Lanza, Audit Chair Steve Heinrichs, and Board Member Albert Yu discussed their desire to fire Steve Melman at one or more PDF Board meetings. [¶] (2) Board Member Sue Billat stated that she was bothered by Lanza's desire to get rid of Melman, given that Melman had done so much for the company and

26

had taken so little money out of the company. [¶] (3) Lanza, specifically, shouted at multiple Board meetings about the need to get rid of Melman. Although Lanza also wanted to fire two other employees, Keith Jones and Dave Josephs, he targeted Melman especially. [¶] (4) Billat did not become aware of how strongly Lanza wanted Melman out of the company until after Melman publicly announced that he has Multiple Sclerosis." (Fns. omitted.)

Melman argues that "because these statements demonstrated the discriminatory animus of PDF decision-makers, [he] should have prevailed on summary judgment." Assuming, without deciding, that Melman has accurately paraphrased the handwritten and partially unintelligible handwritten notes of the investigator, we find that the statements do not serve to create a triable issue of fact as to whether PDF had a discriminatory motive in terminating Melman's employment. As we have discussed, although Melman's evidentiary showing may be sufficient to draw an inference that board members were dissatisfied with Melman and wanted him to leave the company, his showing was insufficient to create more than speculation that they had a discriminatory motive. (*Martin*, *supra*, 29 Cal.App.4th at p. 1735.) Additional evidence that various board members wanted to terminate Melman's employment, without more, does not support a reasonable inference that his termination was motivated by disability discrimination.

We therefore determine that Melman has not demonstrated prejudicial error because, even if the investigator's notes had been admitted into evidence in support of Melman's opposition to the motion for summary judgment, the result would be the same: summary adjudication of the first, second, third and seventh causes of action arising from disability discrimination was properly granted.

## V. DISPOSITION

The judgment is affirmed.

_____
BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
MÁRQUEZ, J.